**Del Eugene LANGE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–00–0348–CR.**

Court of Appeals of Texas, Amarillo.

Aug. 13, 2001.

Rehearing Overruled Nov. 8, 2001.

David S. Barron, Bryan, for appellant.

Bill Turner, District Attorney, Brad Clark, Assistant District Attorney, Bryan, for appellee.

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

BOYD, Chief Justice.

Appellant Del Eugene Lange appeals from his convictions of two counts of aggravated sexual assault and the resulting punishment on each count of confinement for 35 years in the Institutional Division of the Department of Criminal Justice. Finding no reversible error, we affirm the judgment of the trial court.

In six issues, he contends (1) the evidence was factually insufficient to support the verdict, (2) the trial court erred by overruling his objection to improper closing argument, which struck at appellant over the shoulders of his counsel, (3) the trial court erred in overruling his objection to improper closing argument, which interjected the prosecutor's personal opinion regarding the veracity of the alleged victim, (4) the trial court erred in overruling his objections to improper closing argument, which asserted that defense counsel was diverting the jury from the truth, (5) the cumulative effect of the State's closing argument requires reversal, and (6) the trial court erred in allowing the alleged victim to testify at trial by way of closed circuit television.

■ In his first issue, appellant challenges the factual sufficiency of the evidence to support his conviction. The standard by which we review the factual sufficiency of the evidence is well known. *See Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996). In making our review, we must remember that the trier of fact is the sole judge of the weight and credibility of the testimony, and we may not substitute our judgment for that of the jury. *Santellan v. State*, 939 S.W.2d 155, 165 (Tex.Crim.App.1997).

■ Appellant was charged with digital penetration of the sexual organ of his daughter, A.L., a child under the age of 14, on two separate occasions, on January 7, 1995, and August 11, 1996. Although trial testimony was extensive, the nature of appellant's first issue requires us to recite it in some detail. Nicole Lacowski, a physician's assistant, testified that A.L. went to see the doctor on October 8, 1998, for a rash and dark circles under her eyes. After the examination, A.L. appeared upset and wrote a note to Lacowski in which she stated that when she was in kindergarten her father put his finger "up her tee-tee." Lacowski performed an external examination of A.L.'s genitalia and discovered that the hymen had been traumatized and was larger than it should have been in a seven-year-old child. The injury had occurred sometime in the past.

Another exam was performed on A.L. the next day by Jane Riley, a pediatric nurse practitioner for Scotty's House, a child advocacy center. Riley observed that part of the hymen was worn away, which in her opinion was caused by a penetrating act. Riley felt that the injury she observed was consistent with a repeated penetrating injury caused by something larger than a finger. She asked A.L. if anything else had happened to her, but A.L. said no. Riley testified that A.L. did not have a labial adhesion that would have blocked her view of the vagina.

Gerald Kinard, a criminal investigator for the Brazos County Attorney's office, was assigned on October 9, 1998, to investigate the case. He questioned appellant as to whether he had ever applied medication to or washed his daughter's genital area to determine if the child could have misunderstood his actions. Appellant replied he had not. Although appellant repeatedly denied the allegations against him, during a conversation on October 16, 1998, appellant asked Kinard what he would have to say in order to get probation. Even though Kinard did not consider that statement to be a confession by legal definition, he considered it to be incriminating.

A.L. testified by way of video camera. She stated that during the first incident, her mother, brother, and sister were outside. She went inside to get the phone, and her father shut the door. He told her to lie on the bed and to pull her pants down. He then stuck his finger in her private part. At that time, her parents

were still living together. She believed the incident happened during the middle of the day. A.L. said she screamed because it hurt. After appellant took his finger out, he told her to pull up her pants, and that if she told anyone, he would do it again. A.L. testified that she bled when she went to the restroom. A.L. was four or five years old at the time of the first incident.

The second incident happened in her father's trailer. Her parents were separated at that time. She was playing outside and went inside to use the restroom. She believed she was in the first grade. Her father stepped out of the bedroom, pulled her inside, and locked the door. He told her to pull her pants down and did the same thing. A.L. saw blood again when she went to the restroom. Appellant also told her not to tell anyone. A.L. did not tell anyone until she was in the second grade, when she told her mother, who then immediately took her back to the doctor's office to see Lacowski. A.L. admitted she might have told Nick Canto at Scotty's House that her father said he would spank her if she told anyone, but she does not remember her father saying that. She also told Nick that she thought it happened at night, but does not remember it that way now.

On cross-examination, A.L. admitted that she had been afraid of Jerry Buford, her mother's former boyfriend. She also stated that other than the two incidents, her father had never touched her inappropriately. She admitted writing that her mother had slapped her brother and said ugly things and screamed at her; however, she denied being afraid of her mother. She stated she had always been afraid of her father.

Dr. Jennifer Welch, a clinical psychologist specializing in sexual abuse, testified that it is common for children to delay their outcry of sexual abuse. The range of symptoms in sexually abused children include sexualized or seductive behavior such as masturbation, a drop in academic performance, feelings of depression and guilt, disruptions in their relationships, withdrawal, and anxiety. It is normal for the abused child to continue to love the abusing parent. Although some of the symptoms are the same for children who go through a nasty divorce, some are different, such as seductive behavior. Dr. Welch reviewed notes from A.L.'s therapist and concluded that the problems experienced by A.L. are typical of a sexually abused child.

She also stated there are three types of sex offenders. One type is a situational sex offender who has appropriate adult relationships but, if given the opportunity, may commit a deviant sexual act. Any person in the community could be a situational sex offender. The second type is a preferential sex offender whose main sexual preference is something deviant, such as children. The third type is a predatory sex offender whose whole life is focused around something sexually deviant and who prey on their victims. Dr. Welch stated that while there was no psychological test to reveal whether someone abuses children, there are tests to determine if a person would be prone to that type of behavior. However, she commented, some people who are aroused by children do not act on those impulses.

She also stated that if a child is asked the same question more than once, it is possible the child may assume their answer was wrong. Furthermore, leading questions should not be asked. However, she felt that A.L.'s account was consistent and that A.L. did not agree with everything that Canto, the interviewer from Scotty's House, asked her that was potentially leading.

Psychologist Pat Nation began treating A.L. as a patient in February 1999. She said that A.L. brought up that her father had hurt her. Dr. Nation stated that A.L. told her that in the first incident, her father had her lay down on the bed and digitally penetrated her. The same thing happened later in a trailer. A.L. is sad, anxious and has trouble sleeping. She has also engaged in masturbation. Additionally, A.L. has shaved her eyebrows off, which is a self-injurious behavior associated with sexual abuse. Dr. Nation was told by A.L.'s mother, Amy Koronka, that appellant had threatened to cut up Amy if the child revealed what had happened. Dr. Nation feels that A.L. is a truthful person. A.L. told her that she could not recall the beginning of sexual abuse, but it seemed as if her father had always sexually abused her.

Amy admitted in her testimony that her divorce from appellant was bitter and that she had wanted both of the houses they owned. She had also objected to the final divorce, asserting that appellant was hiding assets. She further admitted that she may have said to appellant after the divorce, "Del, you fucked me up my ass."

For the police, Amy made a written list of names of men in whose company A.L. had been. She also stated she had fought to keep appellant's family from seeing her children because they do not believe A.L. She additionally admitted that, without being solicited to do so, she offered to provide testimony for the ex-spouse of appellant's sister so that he could get his children away from appellant's family. However, she admitted it was difficult for her to believe that appellant had molested A.L. when she first learned of it, although she now believes her. She averred that either her daughter told her, or she found out from someone else, that appellant threatened to kill her or her daughter if A.L. told about the sexual abuse.

Amy reported to Child Protective Services (CPS) that her children were coming home injured after they visited their father. She specifically reported a bruise on the back of A.L.'s thigh. A.L. told her at different times that she had been hit accidentally with a football, that she had fallen off a bike, and that she had been spanked. Amy also reported to CPS that her son had whelps on his buttocks. Additionally, she reported to CPS that appellant's home was a health and safety hazard to the children and that he was neglecting their teeth.

Tatia Miller is a psychotherapist who saw A.L. and her siblings in 1997 after appellant brought them to her. She stated that the children said they were afraid of their mother. She had been told that their mother hit her son in the head with a book. Miller reported that incident to CPS. She also testified that A.L. said she wanted to live with her father. Miller saw the children only four times, and she testified for appellant during the divorce proceeding. She admitted she never saw the children after the divorce trial, but averred that she did not detect anything during her examinations that indicated appellant had sexually molested A.L.

A nine-year-old cousin of A.L. testified that at a birthday party on March 31, 1998, A.L. told her that she and her mom "were going to do something really, really bad to her dad." Kristy Terry, appellant's sister, also testified that the cousin told her what A.L. had said at the birthday party. Additionally, appellant's aunt testified that she heard Amy make a statement that if she and appellant ever got a divorce, she was going to make him pay. The aunt also overheard a conversation between Amy and her son in which Amy told the son to tell his "daddy what a jerk he is."

Jamie Ferrell, a registered nurse specializing in sexual assault, reviewed the photographs of A.L. She did not see any attenuation or thinning of the hymen. Because of a labial adhesion, she could not evaluate the hymen. However, she agreed that someone who actually physically examined the child would be in a better position to determine the child's condition.

Lila Pace Belitz, a clinical social worker, first began to treat Amy and her three children in March 1998 to help them cope with the adjustment of divorce. She was still treating A.L. at the time of her outcry. In the summer of 1998, she said, A.L. did not want to go on summer visitation with her father because her feelings were hurt. She also pointed out that children are often conflicted about which parent they prefer during a divorce. Amy was in shock at the time that A.L. outcried. Belitz said that after A.L.'s outcry statement, A.L. told her that her father had digitally penetrated her. She did not believe that Amy was capable of manipulating A.L. into making this statement. She also said that A.L. reported to her that she had received a bruise on her leg by falling off her bike, but later reported that she was actually hit accidentally with a football, and she believed there were some occasions where Amy had exaggerated instances that had occurred.

Psychologist Roy Luepnitz, who is under contract with various agencies to treat sex offenders, was asked to assess appellant. He administered the Able Assessment to appellant, which measures visual response time to various pictures. Nothing in that test led him to believe that appellant was a child molester. Luepnitz also performed psychological testing on appellant to determine the possibility he was a situational offender. In those tests, there were no results that put appellant in the subcategories of a situational offender. However, he explained, the study only determines what the tendencies and attractions are, not whether someone actually acts on those tendencies or attractions. Appellant scored high on his attraction to adult and adolescent Caucasian females, which is a normal adult profile. Appellant also scored high, although not clinically so, on voyeurism and exhibitionism, but those are not particularly relevant to child molesters.

Luepnitz testified that if the mother of a child is histrionic, that is one red flag as to whether an allegation of sexual abuse is false. He felt that Canto interviewed A.L. with a bias and asked a lot of leading questions. There were also inconsistencies in A.L.'s various statements to different people, such as whether the incidents happened during the night or the day and where appellant was located when the assaults occurred. For example, he said, Canto asked A.L. if anything other than digital penetration had occurred, she responded negatively. However, in most cases of child abuse, there is also fondling or kissing. Children can be convinced that events happened which never actually did. Luepnitz also averred that people who are molesting their children are not very likely to voluntarily take their children for counseling. He also stated that most sex offenders also continue until they are caught and do not just stop.

Appellant minimally met the criteria for a narcissistic personality disorder. The tests also indicated he had a strong sense of self-importance and that he was somewhat indifferent and uncaring and tended to minimize problems within himself. However, his personality factors were only minimally high as opposed to moderate or severe. Four possible personality disorders appeared from the results—histrionic, dependent, narcissistic, and borderline. Nevertheless, Luepnitz said, he has done

psychological testing for police and found that they show some of these same characteristics in their profiles. Appellant's scores did not cause him to believe there was a problem. However, he added, a person is more likely to manifest these traits when under stress such as from a divorce.

Christina Hausenfluke, a CPS worker, investigated a report made to her by Lila Pace Belitz that A.L. had received a bruise by falling off a bike. Belitz told her that Amy blows things out of proportion. Hausenfluke noted that there was a concern that Amy may have been trying to lead the children into saying they had been spanked by their father when A.L. stated she had not been spanked. At one point, Hausenfluke asked A.L.'s brother some questions, and he would look at Amy for a response. Hausenfluke also had an interview with the boy alone and did not observe any health or safety hazards in appellant's home, and the home was clean. She contacted the children's dentist and found that the amount of tartar on their teeth was within normal limits for children their age. Another worker ruled out emotional abuse or physical abuse by Amy, although A.L. told the worker she was afraid of her mother.

Appellant denied having ever sexually molested his daughter or touching her inappropriately. The day before, he said, as he left court, Amy came up behind him in her car and shot him "the bird." Unless her mother pushed her, appellant said he knew of no reason why A.L. would want to get him in trouble. He admitted that to his knowledge, he is the only man who has ever been alone with A.L. in his trailer, but does not know if A.L. is lying about having been sexually molested by someone. He denied knowing how to manipulate the Able Assessment. It was his belief that Amy is getting A.L. to blame him.

Appellant averred he did not remember asking Detective Kinard what he had to say to get probation.

Dr. Scott Schams, a pediatrician, examined the photographs of A.L. and testified he did not see a labial adhesion. He also stated there was some stretching or attenuation on the posterior side of the vagina. He further opined that from the photographs, the condition of her vagina and hymen were consistent with penetration.

In light of all this testimony which we have reviewed in somewhat laborious detail, there was evidence from which the jury could have believed appellant's theory of the case, *i.e.*, that his ex-wife had manipulated his daughter into making the accusations against him. Even so, there was also ample evidence in the form of the complainant's testimony and medical testimony from which the jury could have determined that appellant committed the crimes with which he was charged. While there were some conflicts in complainant's repeated telling of the incidents and in the medical evidence, as well as psychological testimony indicating appellant did not have tendencies to molest children, those conflicts and the credibility of the witnesses were well within the province of the jury to resolve, and its findings were not so contrary to the overwhelming weight of the evidence as to be wrong and unjust. Appellant's first issue is overruled.

In his second issue, appellant alleges the trial court erred in overruling his objection to the improper closing argument by the State during the guilt-innocence phase of the trial, which struck at appellant over the shoulders of counsel. The questionable argument is as follows:

The State: See all that reference to me spending six hours with her doesn't mean anything unless he's alluding that I coached that witness. As a prosecu-

tor, Ms. Muldrow and I both took an oath to uphold justice.

Defense Counsel: Striking at the Defendant over my shoulder. We object to it.

The Court: Objection overruled.

The State: (Continuing.) Now, he's here to defend his client. That's the only thing he's here to do.

Defense Counsel: Objection. Same objection.

The Court: Objection overruled.

■■■ There are four permissible areas of jury argument: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) an answer to the argument of opposing counsel, and (4) a plea for law enforcement. *Campbell v. State*, 610 S.W.2d 754, 756 (Tex.Crim.App.1980). The State may not use closing argument to strike at a defendant over the shoulders of his counsel or accuse that counsel of bad faith. *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex.Crim.App.1984).

In *Wilson v. State*, 938 S.W.2d 57 (Tex. Crim.App.1996), the prosecutor made reference to the fact that he wished to see "that justice is done in this case" and that he had "taken a very sacred oath ... to see that justice is done...." *Id.* at 58. He also referred to the fact that defense counsel had taken no such oath and that he wishes "that you turn a guilty man free ... and he can wish that because he doesn't have the obligation to see that justice is done in this case." *Id.* Defense counsel objected, and the trial court overruled it. On appeal, the court found the remarks to be objectionable because they were outside the record, manifestly improper, and prejudicial to the rights of the accused. *Id.* at 60. Those remarks were similar to those made in the case at bar.

■■■ However, the State argues that the remarks were invited. Under the "invited argument rule," the State may argue out-side the record in response to defense argument, which has gone outside the record. *Johnson v. State*, 611 S.W.2d 649, 650 (Tex.Crim.App.1981). During the cross-examination of A.L., the defense brought out that the complainant had spent about six hours talking to the prosecutor. Defense counsel also asked A.L. if she had been coached on how to say things by the prosecutor, to which she responded affirmatively. Additionally, he queried her as to whether her "testimony has changed from when you gave the tape to today after spending six hours with Mr. Clark." In his closing argument, defense counsel further stated:

> Defense Counsel: ... And, you know, they have her for six hours, these prosecutors; and I get one chance to ask her questions. They've got her six hours going over—and over this thing. You heard her talk about it. They talked about things like, well, [A.L.], you know, you said on the tape it happened at night—
>
> The State: Judge, I'm going to object. Going outside the record. He has no idea what we talked about.
>
> The Court: Objection overruled.
>
> Defense Counsel: (Continuing). She testified in there what they talked about. She said they talked about the fact that she said night on the tape, but here in the courtroom it's day. I asked her, 'Well, isn't it important that it be in the day because if it was at night, you wouldn't be outside playing around—your brother and sister wouldn't have been outside playing around. They would be inside and they could hear you scream?' ...
>
> If it were night, that would not have happened. So now it's daytime here in court. Which rendition of this do you think she had the freshest memory?

On October 9th when she talked to Scotty's—I mean, Nick Canto at Scotty's House or here in court after she spent six hours going over this case with the prosecution?

Defense counsel argued that the State had coached the witness into changing her statement. Appellant claims that if the State found his questions to the complainant improper, the State should have objected, and that his closing remarks were not outside the record but were a reasonable deduction from the evidence. Thus, he concludes, the prosecutor was not entitled to go outside the record in response by making reference to his oath.

■■■ The questions asked of the complainant as to the amount of time she spent with prosecutors or the subjects they talked about were not necessarily objectionable, nor were they evidence that the complainant told inconsistent stories. Although the child responded affirmatively when asked if she was coached, there was no evidence that she understood what that meant or that the State actually acted improperly by telling the witness what her testimony should be. It should be no surprise to anyone that prosecutors would meet with a victim to review courtroom procedure and potential testimony prior to trial. Thus, the mere fact that the prosecutors met with the victim, without more, does not mean it is necessarily a reasonable deduction from the evidence that prosecutors have acted improperly in these interviews. The prosecutor was entitled to reply to the argument that the child was improperly coached and the reply argument was within permissible bounds. See Bailey v. State, 804 S.W.2d 226, 229 (Tex. App.—Amarillo 1991, no pet.). Moreover, moments earlier, the prosecutor referred to the fact he had taken an oath not to

pervert justice, to which the only objection was that the prosecutor's personal opinion as to the veracity of the complainant was outside the record, not that the reference to the oath was outside the record.[1] The general rule is that any error in improper jury argument is waived by the failure to make a timely and proper objection. Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim.App.1996), cert. denied, 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997). Appellant's second issue is overruled.

Appellant also objects to the State's closing argument in his third issue, alleging the prosecutor interjected his personal opinion regarding the veracity of the alleged victim. This portion of the closing argument, the subject of appellant's second issue, which immediately preceded the argument under appellant's second issue, is as follows:

> [The State:] You also have to believe that if [A.L.] is lying that she's capable of sustaining that lie for 15 months and fooling all these people, Nicole Lacowski, Detective Stautzenberger, of the Bryan Police, the first person to take the report, Nick Canto at Scotty's House, Jane Riley at Scotty's House—
>
> Defense Counsel: Objection—
>
> The State: Detective Kinard—
>
> The Court: Do I have an objection?
>
> Defense Counsel: Could we approach the bench?
>
> The Court: You may.
>
> Defense Counsel: There's a list up there of about 12 different people that he's saying that she's fooled. Now, the implied in that, Judge, is that all of these people have the conclusion that she was molested and it was Del. There's been no testimony of a number of these names as far as them reaching any con-

---

1. The substance of this argument is set forth in our discussion of appellant's third issue.

clusion. To put the prosecutor's name up there is a personal opinion by him that the child has been—

The Court: I don't think that evidence is before the jury. The objection is overruled.

Defense Counsel: I would like to get a couple of these charts admitted, Judge, for a bill at some point, if I could.

The Court: All right.

The State: (Continuing.) Nicole Lacowski, when she first out-cried, Stautzenberger, Bryan Police, took her over to Scotty's House, Nick Canto at Scotty's House, Jane Riley at Scotty's House, Detective Kinard talked to her afterwards, Lila Belitz who was a counselor, the prosecutors, and finally you. Because I took an oath and I resent his allusions that I'm trying to do a perversion of justice—

Defense Counsel: Judge, now that—

The State: —in coaching that witness.

Defense Counsel: There's no evidence of that.

The State: It's invited argument, your Honor.

Defense Counsel: I object to that as outside the record, what his personal opinion is about this case.

The Court: Objection overruled.

▮▮▮ The gist of the argument is that, because the prosecutor's name was included in a list of people that the victim had to fool if she was lying, he was offering his personal opinion that the victim told the truth and also implying that the other witnesses believed the victim was truthful. When the prosecutor attaches a personal belief to the credibility of a witness, the effect is to bolster the credibility of the witness with unsworn testimony, which is improper. *Robillard v. State*, 641 S.W.2d 910, 912 (Tex.Crim.App.1982). It has also been held error to suggest to the

jury that they should defer to any other person's assessment of the truthfulness of a witness, no matter how experienced that person may be. *Gardner v. State*, 730 S.W.2d 675, 698 (Tex.Crim.App.), *cert. denied*, 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987). However, if the State's argument falls within one of the four permissible categories previously enumerated, it does not constitute error. *Johnson v. State*, 987 S.W.2d 79, 84 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd). Remarks of counsel must be considered within the context of the entire argument. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex.Crim.App.1988); *Kelly v. State*, 18 S.W.3d 239, 244 (Tex.App.—Amarillo 2000, no pet.).

In contending the argument was proper, the State relies on *Wylie v. State*, 908 S.W.2d 307 (Tex.App.—San Antonio 1995, pet. ref'd), in which the defendant, who was convicted of aggravated sexual assault of a child, raised a claim of ineffective assistance of counsel because his attorney failed to object to jury argument in which the prosecutor attempted to uphold the credibility of the child complainant and inferred that the child had "convinced" a number of witnesses. Because the defense strategy was to attack the complainant's credibility by suggesting she had a tendency to fabricate and was influenced by the prejudices of others, the arguments of the State were found to be a response to the defense and reasonable deductions from the evidence. *Id.* at 310.

In *Kelly*, the prosecutor made the statement he would "put every bean I have got on Mathew Jackson" in response to argument from defense counsel that the witness had misidentified the defendant. We found that the State's argument was a response to defense counsel's argument and also a reasonable deduction of the evidence in light of testimony from the

witness of four separate opportunities he had to observe the defendant. *Kelly*, 18 S.W.3d at 244–45.

Similarly, in *Richards v. State*, 912 S.W.2d 374 (Tex.App.—Houston [14th Dist.] 1995, pet. ref'd), the prosecutor argued that "... the only person who testified completely truthfully in this case and did not make a single mistake was Bernard Phearse. He is the only person in my opinion." *Id.* at 379. The court noted that the defense strategy was to disprove the complainant's credibility by implying the testimony was influenced by others, particularly the prosecutor. The court concluded that the statement was not an improper attempt to bolster the testimony because it was a reasonable deduction from the evidence and a summation of the evidence. *Id.* at 380.

Defense counsel attempted during the trial and closing argument to attack the complainant's credibility by showing inconsistencies in her story and that she had been manipulated by others into bringing the allegations. During cross-examination, she was specifically questioned as to each person she had spoken to about the alleged incidents, including the prosecutors. The State's response was to attempt to demonstrate consistency in her story by referring the jury to those witnesses to whom she had relayed the incidents. The prosecutor never directly stated that he believed the complainant. He stated that if the jury believed she was lying, they also had to believe that she had fooled the witnesses who testified at trial as to her version of the events. The prosecutor also included himself as one of the persons the complainant would have had to fool.

Similarly, in *Wylie*, two of the witnesses mentioned did not testify at trial, but because their names were brought out in the testimony of other witnesses, it was a reasonable deduction from the evidence for the prosecution to refer to them again. *Wylie*, 908 S.W.2d at 310. In this case, although the prosecutors were not witnesses, the complainant was questioned regarding her discussions with the prosecutors about her allegations. In light of the defense argument that the complainant had been influenced in her testimony by others, including the prosecutor, we believe the prosecutor's statement was a proper response to that argument. Appellant's third issue is overruled.

■ In his fourth issue, appellant attacks the trial court's overruling of his objections to the State's argument that he attempted to divert the jury from the truth. Appellant cites us to two separate occurrences in the record. The first exchange was as follows:

The State: Well, they can hardly smear a 7–year–old can they? I mean, it would be ludicrous to try to smear a 7–year–old. So they do the next best thing. They find the closest person to the victim, and they do their best to drag her down into the mire. And the hope is that it can generate enough dust and smoke—

Defense Counsel: Objection, Judge—

The State: —from the truth of this case.

Defense Counsel: Same objection.

The State: Judge—

The Court: Objection overruled.

■ The second exchange occurred shortly thereafter:

The State: (Continuing.) Well, ladies and gentlemen, I think we can all agree that there's a lot of different defenses you can throw out; but there's only one truth. And they've thrown out a lot of different defenses. And you can ask yourself: Do they really intend for us to follow all these·defenses? Did they argue them all the same? Can they all be

true, or are they really just an effort to distract us from the truth?

Defense Counsel: Objection. Same objection, Judge.

The Court: Objection overruled.

The State: (Continuing.) Let's talk about some of these rabbit trails.

Defense Counsel: Objection. Rabbit trails again. Same objection.

The Court: Objection sustained.

Defense Counsel: Ask for instruction to disregard.

The Court: Jury is instructed to disregard.

Defense Counsel: Move for mistrial.

The Court: Denied.

The State: (Continuing.) The first of these so-called offenses—so common prosecutors have an acronym for it—some other dude did it. And Mr. Bryan appears to have abandoned that in his closing argument. During the trial there were allusions to Allen Hickman and there were allusions to Jerry. There were allusions to his friend, Brian. Fortunately, we could clear that up when he took the stand; and there's other people that could have done that.

And the Defendant's actions indicate that there's no other person that did it. Imagine a father falsely accused and believing that his daughter at least might have been molested—

Defense Counsel: Judge, got "rabbits" written at the top of his chart: and that is case law and specifically held that that is improper. We object.

The Court: The jury has been instructed to disregard that comment.

Defense Counsel: Could we have the chart taken down or at least that part of it, Judge?

The Court: No. The jury has been instructed to disregard it. Ladies and gentlemen, you'll abide by my instruc-

tions. Do you understand that? Very well.

Appellant contends that this argument was an uninvited accusation of improper conduct on his part. As we noted in *Howard v. State*, 896 S.W.2d 401 (Tex.App.—Amarillo 1995, pet. ref'd), it is important to differentiate between comments which facially appear aimed at defense counsel but actually strike at his argument. *Id.* at 405. Counsel runs the risk of improper argument when it is made in terms of defense counsel personally and explicitly impugns his character. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App.1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). In *Howard*, the State analogized the defense tactic to a "bunny trail" and charged defense counsel with presenting false issues, but it did not charge the defense with actually manufacturing false evidence. *Howard*, 896 S.W.2d at 405. We held that given its brevity, its de minimis derogatory content, and its direct relationship to the defendant's argument, the statements were permissible. *Id.*

Furthermore, in *Beasley v. State*, 864 S.W.2d 808 (Tex.App.—Fort Worth 1993), *aff'd*, 902 S.W.2d 452 (Tex.Crim.App.1995), the prosecutor argued that the jury could see through the "clouds of smoke screen" presented by the defense. Because the argument was made in response to argument by defense counsel that tried to place emphasis on the character of the victims rather than the acts of the defendant, the argument was found to be a proper response. *Id.* at 812. In *Gonzales v. State*, 831 S.W.2d 491 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd), the prosecutor's reference to "bunny trails" and "rabbit trails" was also held to be a response to argument of defense counsel that the theft had been completed before flight and the exhibition of a knife, thereby constituting a separate offense. *Id.* at 494.

■■■■ During closing argument, defense counsel here had asserted that the complainant's mother was bitter about her divorce, was trying to get back at appellant and his family and she had manipulated her daughter into making false accusations. There was also trial testimony that the complainant had been alone with other males who may have had an opportunity to assault her. We therefore believe that the State's argument was in response to defense counsel's closing argument and evidence presented at trial. Moreover, even assuming the references to "rabbit trails" were improper, reversible error is shown only if substantial rights have been affected. *Mosley*, 983 S.W.2d at 259. In making that determination with respect to improper argument cases, courts generally look to the severity of the misconduct, measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *Id.* In this instance, the State did not charge that defense counsel had manufactured evidence and the court sustained the objection to the use of "rabbit trails" and instructed the jury to disregard it, as well as the chart where the phrase appeared. While the veracity of the complainant was hotly contested at trial, given the mild effect of the conduct and the court's instruction, we do not believe reversible error occurred. Appellant's fourth issue is overruled.

■■■■ Appellant asserts in his fifth issue that the cumulative effect of the State's improper jury arguments requires that the case be reversed. Appellant cites to no specific argument, and we must therefore assume he refers to his allegations of improper argument referenced under his previous issues. He also states that he objected 16 times during the State's closing argument and that 11 of those objections were sustained. He further cites to *Grant v. State,* 738 S.W.2d 309 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd), as authority for the argument that each time the court has to sustain an objection and instruct the jury to disregard, the chances that the jury will be able to do so are diminished, and therefore the cumulative effect of the argument was so prejudicial that the instructions by the trial court could not overcome the harm sustained by him. In *Grant,* the court noted that the prosecutor ignored the trial court's rulings, stated as fact evidence that was not in the record, drew conclusions from facts not in evidence, and argued law that was contrary to the court's charge. *Id.* at 311.

The only specific instances of alleged improper conduct before us are those we have already discussed in which we found either not to have been improper or not to constitute reversible error. The prosecutor's conduct therefore does not rise to the egregious level discussed in *Grant.* Thus, appellant's fifth issue is overruled.

■■■■ In his final issue, appellant argues the trial court erred in allowing the victim to testify by way of closed circuit television because the State did not establish a proper predicate that the emotional impact on the victim was more than "de minimis," and therefore, appellant's right to confront the witnesses against him was violated. Appellant posits that the evidence necessary to establish the emotional harm to the child should be by some third party, not the child or its parent.

The State filed a motion pursuant to article 38.071 section 3 of the Code of Criminal Procedure to have the victim testify by closed circuit television in a room other than the courtroom. The court held a hearing on the matter, at which the victim's mother testified that A.L. was in therapy with respect to her molestation by her father. She further testified that A.L. has anxiety, cries easily, has trouble sleeping and these problems have increased as

the time of trial has grown closer. A.L. has been prescribed both Zoloft and Zanax for her anxiety. In Amy's opinion, the child would be traumatized by having to testify in the presence of her father, because she has said that she does not want to see him and physically hides when they pass his truck on the road. If A.L. had to testify in the courtroom, she opined, A.L. would "freeze" and "emotionally breakdown." A.L. herself testified that she was "very nervous" around her father because she did not want him to do the same thing to her again and that she was "very scared" of him.

The court announced that it was making its ruling based on the testimony of the child and her mother and the records of Dr. Tatia Miller which were admitted by appellant. In its written order, the court found that "exposure to the Defendant would cause serious emotional distress [to] the child alleged to be the victim of the Defendant in the above numbered cause of action, to the degree that the child could not reasonably communicate." However, the order provided that appellant would be permitted to observe and hear the testimony and communicate contemporaneously with his attorney during periods of recess or by audio contact, but the child would not be allowed to hear or see appellant. The judge and attorneys were in the room with A.L. when she testified, and appellant's counsel had a full opportunity for cross-examination.

■ In *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the Court found that the defendant's right to confrontation is not violated by use of special procedures if the State makes an adequate showing of necessity because the state interest in protecting child witnesses from the trauma of testifying in child abuse cases is sufficiently important. *Id.* at 837–38, 110 S.Ct. 3157.

However, it instructed, the trial court must hear evidence and determine that use of a one-way closed circuit procedure is necessary to protect the welfare of the witness, that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant, and that the emotional distress suffered by the witness is more than de minimis, *i.e.*, more than mere nervousness or some reluctance to testify. *Id.* at 838, 110 S.Ct. 3157. This process was adopted by Texas in *Gonzales v. State*, 818 S.W.2d 756, 764 (Tex.Crim. App.1991), *cert. denied*, 507 U.S. 939, 113 S.Ct. 1334, 122 L.Ed.2d 718 (1993). It is the third required finding that appellant asserts has not been sufficiently established.

While appellant cites us to several authorities in which a third party provided testimony at the hearing, he has cited us to no authorities that stand for the proposition that the evidence necessary to support the trial court's determination that the emotional distress suffered by the child is more than de minimis must come from an independent third party such as a physician, child psychologist, social worker or other professional. Appellant posits that the self-serving statements of fear by a victim or her parent would allow the use of closed circuit television testimony by any victim in any case. We do not agree. The trial court would still have the responsibility to determine the level of fear to be suffered by the witness as might be shown by testimony as to the severity of symptoms and medication prescribed, as well as the credibility and demeanor of the victim and/or her parent in making its determination. While testimony from a medical professional, counselor, or therapist may assist the court in its determination, we are unwilling to require it as a condition of the court making the "more than de minimis" finding. We believe that, in this instance,

the testimony provided by the victim and her mother supports the trial court's finding the child would suffer severe emotional distress. Appellant's sixth issue is overruled.

Having overruled all of appellant's issues, we accordingly affirm the judgment of the trial court.

Johnson, J., dissents.

JOHNSON, Justice, dissenting.

As complained of by appellant's second issue, the prosecutor at one point during State's rebuttal summation stated that he had taken an oath and resented allusions of defense counsel that the prosecutor was trying to do a perversion of justice. The argument was met with an objection that "There's no evidence of that." Then, when the prosecutor immediately responded that the argument was invited, defense counsel further objected that the prosecutor's opinion was outside the record. The objections were overruled. The context of the argument and the objections do not indicate that the trial judge was confused as to what appellant was objecting to and the basis for his objection. *See* Tex.R.App. P. 33.1(a)(1).[1]

After the trial court overruled defense counsel's objections, the prosecutor immediately continued by arguing, in the same vein, that defense counsel was "alluding that I coached that witness. As a prosecutor, [co-prosecutor] Muldrow and I both took an oath to uphold justice." An objection that the State was striking at defendant over the shoulder of counsel was overruled. *See Wilson v. State*, 938 S.W.2d 57, 60 (Tex.Crim.App.1996). The prosecutor then continued with the argument that "Now he's here to defend his

client. That's the only thing he's here to do." Defense counsel objected again, and the objection was overruled.

The State does not attempt to point to evidence in the record of an oath taken by the prosecutors "to uphold justice". Instead, the State classifies its argument as proper because it was in answer to argument of opposing counsel, and was thus invited argument. The invited argument rule permits prosecutorial argument outside the record in response to defense argument which goes outside the record. *See id.* at 60.

The case against appellant was, in effect, a contest of credibility between the prosecutrix and appellant. The prosecutrix testified that appellant molested her when she and appellant were alone. Appellant denied the accusations. The State presented evidence from numerous witnesses to support the prosecutrix' testimony that her vagina had been penetrated; the defense presented witnesses to question whether her vagina had been penetrated. The prosecution presented testimony to buttress the argument that the prosecutrix' reports over time were consistent and truthful; the defense attempted to impeach the credibility of those witnesses, and also presented witnesses and evidence to buttress appellant's credibility. The prosecutrix testified, in part, on cross-examination that the State's attorneys (1) spent several hours with her in preparing the State's case, (2) met with her the day before she testified and talked to her about how she was going to testify, (3) "went over the whole thing again," and (4) "kind of told [me] how to say things" when she was asked questions. She agreed that her testimony about some details of the molestations, after spending several sessions

---

1. Further references to a Texas Rule of Appellate Procedure will be by referencing "Rule ...."

with the prosecutor, differed from her prior videotaped statement. On re-direct examination by the State, the prosecutrix testified that the State's attorneys never told her to make anything up about her father, and that the State's attorneys' "number one rule" was to always tell the truth.

Final arguments were vigorous. Appellant's counsel questioned credibility of the prosecutrix in his final argument. Part of his argument addressed her trial testimony in which she agreed that her trial testimony differed from statements she made before having met with prosecutors.

During trial the prosecutrix testified on cross-examination that she discussed with the prosecutors what happened to her. She agreed that she had been "kind of" told how to answer questions by the prosecutors, although as previously noted, she also testified that the prosecutors told her to always tell the truth. Defense counsel was not outside the record and was not drawing unreasonable inferences from the record in commenting on the prosecutrix' six or so hours of time spent discussing the case with the State's attorneys and the differences in her testimony at trial from her statements made before her conferences with the State's attorneys. The prosecutor would have been within the record to remind the jury that the prosecutrix testified that she was never asked to lie or make anything up by the State's attorneys, and that the State's number one rule was for her to tell the truth. The prosecutor did not choose that argument, however. Nor did he choose to stay within the record in responding to defense counsel's argument.

Departing from the trial record and reasonable inferences to be drawn from the record cannot be justified as invited argument when defense counsel's argument was based on the trial record and reasonable inferences from the record. Compounding the effect of the argument that the prosecutors were acting pursuant to an oath to uphold justice was the trial court's stamp of approval to the argument by overruling defense counsel's objection, and the prosecutor's immediate follow-up comparative assertion to the jury that defense counsel was only there to defend his client and that was the only thing he was there to do. The trial court approved that argument, also, by overruling counsel's objection.

In sum, shortly before the jury retired to deliberate on appellant's guilt or innocence, the jurors heard the State's attorney, in effect, tell them with court approval that the prosecutors had taken an oath to do justice in presenting their evidence, examining witnesses, making statements during trial, presenting jury summations and trial conduct, whereas the defense attorney had no constraints on presenting testimony, examining witnesses, making objections, making jury summations and his other trial conduct except that his actions be in defense of his client. The State's argument and the trial court's approval provided the jury with an improper framework for evaluating all that occurred during trial. The State's presentation, evidence and attorneys were to be viewed with an aura of "seeking justice," while appellant's presentation, evidence and defense attorney were to be viewed as having no guiding standard but the amoral standard of "whatever it takes" to obtain a not guilty verdict.

The State's response clearly went outside the record in referencing both the oaths taken by the prosecutors and the obligations of defense counsel. *See Wesbrook v. State*, 29 S.W.3d 103, 115–16 (Tex. Crim.App.2000); *Wilson*, 938 S.W.2d at 60. The Texas Constitutional oath which is required to be taken by a prosecuting or

assistant prosecuting attorney, and which was not before the jury in any event, does not include an oath to "uphold justice." *See* Tex. Const. art. XVI, § 1; Tex. Gov't Code Ann. § 41.101, 103(a) (Vernon 1988). Because the argument was not founded in the record, neither the jury, the trial judge nor this court can determine what oaths the prosecutors took, the content of the oaths, and if the prosecutor's argument as to the oaths was correct.

Assuming that defense counsel was licensed as an attorney, he had taken the oath required for licensure. That oath required him to uphold the Constitutions of the United States and of Texas and to honestly demean himself in the practice of law. *See* Tex. Gov't Code Ann. § 82.037 (Vernon 1988). He was subject to (1) rules of conduct of the State Bar, (2) the trial court's control, (3) the Lawyers Creed and (4) had a professional obligation to represent his client to the best of his ability, *see id.*, within the bounds of the law. *See Bradt v. West*, 892 S.W.2d 56, 71 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Defense counsel was under more of an obligation than just "to defend his client. That's the only thing he's here to do."

At best, the prosecutor's argument was a misrepresentation to the lay jury of the relative obligations of State's counsel and defense counsel. And, it was approved by the trial court. Moreover, the argument was made at a time when defense counsel had no opportunity to respond. The State asserts that the argument was not an effort to taint the trial process. Yet, as noted by the Court of Criminal Appeals, "For many years this Court has recognized prosecutors' arguments which attack defense counsel are manifestly improper because they serve to inflame the minds of the jury to the accused's prejudice." *Wilson*, 938 S.W.2d at 59. I conclude that the

trial court erred in overruling appellant's objections to the State's argument. Furthermore, I view appellant's objections as having been timely and, as worded and in context with the prosecutor's arguments, as having been sufficient to preserve error. *See* Rule 33.1(a)(1); *Wilson*, 938 S.W.2d at 60 ("this type of argument strikes at the defendant over the shoulders of counsel").

Improper jury argument is error of non-constitutional dimension. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App.1998) (on reh'g). An error other than a constitutional error must be disregarded if the error does not affect substantial rights. Rule 44.2(b). An error affects a substantial right of the defendant when the error has a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997). A criminal conviction will not be reversed for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *See* Rule 44.2(b); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

The matter before us was a hotly-contested, emotionally-charged case with directly conflicting testimony from not only the prosecutrix and appellant, but also from other witnesses as to credibility of the prosecutrix, credibility of the appellant and medical matters. Unlike cases exemplified by *Wilson*, the State's case was not "strong, if not overwhelming" because built on independent eyewitnesses. *See Wilson*, 938 S.W.2d at 63–4 (Mansfield, J., dissenting). The effect and harm of the State's jury argument reached back to color evidence presented and statements and actions by prosecutors and defense counsel from voir dire through closing arguments. The issue before us is addressed by lan-

guage of the Texas Court of Criminal Appeals in *Wilson:*

> In the instant case it is evident the prosecutor was intent upon informing the jury of the distinction he perceived between the oath of a prosecutor and the oath of a defense attorney. It is equally evident that the prosecutor sought to emphasize that such a distinction involved an obligation to 'seek truth and justice.' ... [T]he general public does not understand the concept that defense attorneys are under an ethical obligation to represent the accused regardless of their personal opinion as to the guilt of the accused.... [T]he State re-emphasized the argument after defense counsel objected, and thus compounded the prejudicial effect upon the jury.... [T]he trial judge twice overruled defense counsel's objection to the State's improper arguments, and by doing so further aggravated the harm [by putting] 'the stamp of judicial approval' on the improper argument.... [W]e are still unable to understand why a prosecutor would depart from the well established rules for proper jury argument. From the cases cited in part II. of this opinion, it is clear that the type of argument presented here has never been permitted. 938 S.W.2d at 61–62.

The argument complained of via appellant's second issue was manifestly improper and injected new and harmful matters. It was designed to alter the jury's perspective of and framework for evaluating the actions of the attorneys, the trial proceedings, and the evidence. Appellant's trial counsel did not invite the argument by arguing outside the trial record. I would hold that the trial court erred in overruling appellant's objection to the State's argument and that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see King,* 953 S.W.2d at 271, had more than a slight

effect on the jury, *see Johnson,* 967 S.W.2d at 417, and warrants reversal of the judgment. Rule 44.2(b).