NO









NO. 12-02-00178-CR

 

                     IN THE COURT OF APPEALS 

 

          TWELFTH
COURT OF APPEALS DISTRICT

 

                                TYLER,
TEXAS

KERRY LEE MIMS,                                         '                 APPEAL FROM THE
372ND

APPELLANT

 

V.                                                                         '                 JUDICIAL
DISTRICT COURT OF

 

THE STATE OF
TEXAS,

APPELLEE                                                       '                 TARRANT COUNTY,
TEXAS

                                                                                                                                       
                    

                                                     MEMORANDUM
OPINION

Kerry Lee Mims (AAppellant@) was indicted for capital murder. 
A jury convicted Appellant of murder and assessed his punishment at
imprisonment for life.  Appellant raises
five issues on appeal.  We affirm.

 

                                                               Background








Carlos Menendez (AMenendez@) and his wife, Sophia Garcia (AGarcia@), operated a Alunchette@ from their large utility van, selling Mexican food and fruit to local
residents.  On the evening of August 14,
1999, they were on the parking lot of the Ballpark Apartments in north Arlington where they were closing their business for
the day.  Menendez was standing near the
driver=s seat holding an unknown amount of cash when Appellant suddenly
entered the van, pointed a pistol at Menendez, and said, AGive me the money, m_____f___er.@  Appellant then shot Menendez
and both men fell out of the van beside the door.  According to Garcia, the assailant was a
black man who shot her husband with a small silver pistol that he held in his
right hand.  Another black man was
standing outside the truck, but Garcia saw him only as he was picking up money
from the ground.  Garcia recalled that
the two men grabbed the money and ran. 
The gunshot perforated Menendez=s aorta and lacerated both his lungs. He died at the scene. 

Later that evening, the police detained an individual and asked Garcia
to attempt to identify him.  She told the
police that the suspect was not the assailant. 
On August 17, 1999, two Crime Stopper tips provided information to the
Arlington police that the possible assailant was a person named AKerry White@ who lived at the La Jolla Apartments. 
Arlington detectives went to the apartments to attempt to locate AKerry White@ (AAppellant@).  There, Detective Byron
Stewart (ADetective Stewart@) spoke to Nathan Pickrom (APickrom@) who allegedly told him that Appellant had bragged about killing the
Mexican man on Peach Street.  Detective
Stewart notified Detective John Stanton (ADetective Stanton@) who searched their computer systems for information on the
suspect.  As a result, Detective Stanton
obtained a description of Appellant=s vehicle and issued a BOLO (Abe on the lookout@) for his car.  The police
subsequently located the car, which was being driven by Appellant=s friend, Bobby Stewart (AStewart@).  Information from Stewart led
to Appellant who was hiding on the roof of Stewart=s apartment.  Appellant was
arrested and agreed to an interview. 
Upon his arrival at the Arlington jail, Appellant waived his rights and
told Detective Stanton that he had gone to a club with friends on the night of
August 14.  Appellant=s friends could not confirm this information, and Appellant was not
eliminated as a suspect.

On the day of Appellant=s arrest, Garcia was shown a photospread
that included Appellant=s picture.  Garcia picked
Appellant from the photospread and said that she was
seventy per cent certain Appellant was Menendez=s assailant.  However, Garcia
was not absolutely sure and asked for a live lineup.  This lineup was performed the next day, and
Garcia picked Appellant from the live lineup stating that she was Avery certain.@  The lineup consisted of
subjects ranging in age from 18 to 39 and weighing between 143 and 190
pounds.  The subjects were seated during
the lineup because of their height variances.

Soon after the completion of the live lineup, Detective Stanton asked
that Appellant be brought to the interview room where he once again advised
Appellant of his rights.  Detective
Stanton told Appellant that he had been positively identified, that he knew
Appellant had not been honest with him, and that there was sufficient evidence
to file a capital murder charge in the case. 
Once again, Appellant denied any involvement in Menendez=s death.








Detective Stanton received a phone message on August 23, 2002,
indicating that Appellant wanted to speak to him.  Detective Stanton went to the jail and once
again advised Appellant of his rights. 
Appellant gave a written statement admitting that he participated in the
robbery. 

Appellant was indicted for capital murder.  The indictment contained a deadly weapon
notice and enhancement paragraphs alleging two prior felony convictions.
Appellant pleaded Anot guilty@ to the capital murder charge and Anot true@ to the enhancement paragraphs of the indictment.  Prior to trial, Appellant filed a motion
to suppress his oral and written statements and a motion to suppress the
identification.  After a hearing, the
court overruled Appellant=s motions, and the matter proceeded to a jury trial.        

After three days of testimony, the jury convicted Appellant of the
lesser-included offense of murder.  At
the conclusion of the punishment phase, the jury found both enhancement
paragraphs true and assessed Appellant=s punishment at imprisonment for life. 
The trial court entered judgment in accordance with the jury=s verdict.  This appeal
followed.

 

                                                Eyewitness Identification

In his first issue, Appellant asserts that the trial court abused its
discretion by excluding the proffered testimony of Dr. Mary Connell (ADr. Connell@), an expert in eyewitness identification issues.  The State counters that Appellant failed to
prove Dr. Connell=s testimony was based upon a valid application of a valid scientific
principle and that Dr. Connell failed to consider enough pertinent facts for
her opinion to be helpful to the jury.

During Appellant=s case in chief, Appellant=s trial counsel notified the court that they intended to call Dr. Connell ,a psychologist, to testify about factors that would
affect the accuracy of Garcia=s identification of Appellant as Menendez=s assailant.  The trial court
held a Daubert[1]
hearing to determine the admissibility of Dr. Connell=s testimony.








At the hearing, Dr. Connell testified that she is board certified in
forensic psychology.  She has been in
private practice in the area of psychology since 1980.  Less than one-tenth of her practice has
involved pure eyewitness identification. 
She has written one article on the subject, which has not been published
or peer-reviewed.  She testified that she
has done no research on the reliability factors about which she proposed to
testify and has not been associated with any group conducting research on the
factors.  She has been retained six times
in the past to testify about the reliability of eyewitness testimony.  She stated that she reviewed the testimonies
of Garcia and Detective Stanton from the suppression hearing, the photo array
photographs, the photos from the live lineup, and photographs of the crime
scene. 

Dr. Connell also reviewed approximately twenty-five articles on
eyewitness identification.  During direct
examination, she discussed treatises, studies, research, and general areas of
methodology.  She emphasized a seminal
article referred to as the AWhite Paper.@  See Gary L. Wells et al., Eyewitness Identification Procedures:
Recommendations for Lineups and Photospreads, 22
Law and Human Behavior 6 (1998).  She
testified that this article was endorsed by the American Psychology and Law
Society as its position paper.  She also
said that the article Arefers to there being a body of literature numbering something like
2000 articles in the past twenty-five years in peer review mainstream
journal[s] on the science of eyewitness reliability issues or eyewitness and
lineup instruction.@  In addition to the White
Paper, Dr. Connell relied on a 1999 United States Department of Justice (ADOJ@) publication entitled AEyewitness Evidence, a Guide for Law Enforcement.@  This publication contains the
DOJ guidelines for eyewitness identification procedures.  Neither document includes information that
speaks directly to the issue of reliability. 
Both are general treatises and contain discussions of recommended
methodologies.

Dr. Connell named a number of psychologists who are recognized
researchers in the field and who have published peer-reviewed articles about
eyewitness identification.  She also
testified that the reliability of eyewitness identification is accepted within the
scientific community.  She stated that
the researchers have agreed upon fifteen or so major tenets of the body of
eyewitness research at or over eighty percent and that for some tenets as many
as ninety-six or ninety-seven percent of the researchers are in agreement.  She also stated that the research and
scientific theory are widely accepted in the field of psychology.








Dr. Connell=s proposed testimony would cover cross-racial identification and, to
some extent, weapon focus.  She also
intended to discuss several matters relating to the ideal structure and manner
of conducting the lineup and photo array. 
Specifically, Dr. Connell would examine the method used in the photo
array and lineup in this case in which Garcia identified Appellant as the man
who robbed and shot her husband on the evening of August 14, 1999.  She also planned to testify about how
variations in the process can affect witness correctness.  However, she would not offer an opinion about
the correctness of Garcia=s identification.  She also did
not plan to testify that the photo array was done improperly or inaccurately in
this particular case.  

In explaining her opinion about the lineup and photo array in the case
before us, Dr. Connell testified that

 

I do have some . . . concerns that I will want
to raise about some of the variability in people in the live lineup, the weight
range from 145 to 220 pounds, and the age range from 18 to 39, for example, and
that it might be very easy for a mock witness, a person who didn=t view the suspect at the time of the crime, to
pick No. 2 from the live lineup based simply on the witness=s written description, the witness description
that was reported by the police officer at the scene.

 

 

...[T]he
photo array by itself appeared to me to have been done with attention to most
of the details that have been identified in the literature as important,
exceptions being that the person administering it was apparently the lead
investigator and that we can=t know since it wasn=t recorded whether any cues may have been given
to the witness.

 

And the witness B neither the witness nor Detective Stanton has
testified or indicated that he gave her the explicit instruction that the
culprit might not be present in the photo array.

 

And so that would be a concern that would be
important for me to articulate.

 

 

Dr. Connell admitted that in formulating her opinion, she did not take
into account Appellant=s written confession.  Moreover,
she did not have an article dealing with the accuracy of eyewitness
identification when the suspect perpetrator also confessed.  Furthermore, she testified that she knew of
only one case included in the White Paper where both eyewitness testimony and a
confession turned out to be incorrect. 
She acknowledged that her proposed testimony was based upon the research
and peer-reviewed articles of others, as well as her own practical application
in her profession.  Dr. Connell also
testified that the literature indicates that factfinders
tend to mistakenly ascribe a high degree of relationship between witness
certainty and witness accuracy. 
Consequently, she believed the jury would benefit from the information
she would provide.

After the hearing, the trial court found that Appellant failed to
carry his burden by clear and convincing evidence that the proffered evidence
was sufficiently relevant and reliable to assist the jury.








Standard of Review

We review the trial court=s decision to admit or exclude expert testimony under an abuse of
discretion standard.  Kelly
v. State, 824 S.W.2d 568, 574 (Tex. Crim.
App. 1992).  An abuse of
discretion occurs when the trial court acts without reference to any guiding
rules and principles or acts arbitrarily or unreasonably.  Montgomery v. State,
810 S.W.2d 372, 380 (Tex. Crim. App. 1990).  However, if the trial court=s decision to admit or exclude the expert testimony is Awithin the zone of reasonable disagreement,@ it does not abuse its discretion. 
See Kelly, 824 S.W.2d at 574; Montgomery,
810 S.W.2d at 391 (op. on reh=g).  In determining whether a trial court abused
its discretion, we review the trial court=s ruling in light of what was before the trial court at the time the
ruling was made.  Hoyos v. State,
982 S.W.2d 419, 422 (Tex. Crim. App. 1998).

Applicable Law and Analysis

The admissibility of expert testimony is governed by rule 702 of the
Texas Rules of Evidence, which provides that

 

[i]f scientific,
technical, or other specialized knowledge will assist the trier
of fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education
may testify thereto in the form of an opinion or otherwise.

 

 

Tex. R. Evid. 702.  Under Rule 702, the
proponent of scientific evidence must show, by clear and convincing proof, that
the evidence he is proffering is sufficiently relevant and reliable to assist
the jury in accurately understanding other evidence or in determining a fact in
issue.  Kelly, 824 S.W.2d at 573. 








The reliability of Asoft@ science evidence, such as Dr. Connell=s testimony, may be established by showing that (1) the field of
expertise involved is a legitimate one, (2) the subject matter of the expert=s testimony is within the scope of that field, and (3) the expert=s testimony properly relies upon or utilizes the principles involved
in that field.  Nenno v. State,
970 S.W.2d 549, 561 (Tex. Crim. App. 1998).  These questions are merely an appropriately
tailored translation of the factors used to determine the reliability of hard
sciences.[2]

Reliability

In Nenno, the State=s expert witness was allowed to testify, over the defendant=s objection, about the defendant=s future dangerousness.  The
appellant contended at trial and on appeal that the State had not met its
burden to show that the expert=s testimony was reliable.  Id. at 560. 
The court of criminal appeals disagreed. 
Id. at 562.  In its analysis, the court recognized that
the reliability requirement Aapplies [to the soft sciences] but with less rigor than to the hard
sciences.@  Id.
at 561.  Furthermore, the hard
science methods of validation, such as assessing the potential rate of error or
subjecting a theory to peer review, may often be inappropriate for testing the
reliability of fields of expertise outside the hard sciences.  Id.  However, the court expressly declined to rule
out employing these factors in a proper case. 
Id. n.9.

Applying the Asoft@ science criteria, the court held that the expert=s testimony was sufficiently reliable, partly because the expert had
extensive experience in studying and analyzing cases concerning the issue of
future dangerousness.  Id.
at 562.  Although the appellant
complained of the absence of any peer review, the court stated that this
affected the weight of the evidence rather than the reliability.  Id.

The distinction between the standard of admissibility for Ahard@ science versus that for Asoft@ science was revisited by the court of criminal appeals in Weatherred v. State, 15 S.W.3d
540 (Tex. Crim. App. 2000).  The issue in Weatherred
was whether the court of appeals erred in holding the trial court=s exclusion of expert testimony on the lack of reliability of
eyewitness testimony was an abuse of discretion.  The court of criminal appeals applied the Nenno standard of reliability
for Asoft@ science.  Id.
at 542.  








Reviewing the expert testimony proffered in the trial court, the court
determined that the proffer was lacking. 
To carry its Aconsiderable burden@ in the trial court, the defendant had offered the expert=s testimony, but nothing else.  Id.  Furthermore, despite the expert=s claim that he and others had carried out extensive research on the
reliability of eyewitness identification and that he himself had written much
on that subject, he failed to produce or even name any of the studies,
researchers, or writings in question.  Id. at 542-43. 
The trial court did not state its reason for excluding the
testimony.  Id.
at 543.  However, the court of
criminal appeals concluded that based upon what the trial court had before it
at the time it ruled, it could have reasonably concluded that Appellant
failed to carry his burden of showing that the proffered expert testimony was
scientifically reliable. Id. (citing Jordan v. State,
950 S.W.2d 210, 212 (Tex. App.BFort Worth 1997, pet. ref=d)) (emphasis in original). 
Thus, the court of criminal appeals reversed the court of appeals= holding that the trial court had abused its discretion in excluding
the expert testimony.  Id.

In our review of Dr. Connell=s testimony, we note that, unlike the expert in Nenno,
Dr. Connell had done no research in the area of eyewitness identification.  She had written only one article, which had
not been published or peer-reviewed.  Her
professional experience was in dealing with child custody and family
issues.  Less than one-tenth of her
practice involved eyewitness identification. 
She could think of Aprobably six@ cases where she had testified regarding the reliability of eyewitness
testimony, but could not name those cases. 
She could recall only one case that involved testimony before a
jury.  Similar to the expert in Weatherred, Dr. Connell testified that she
relied on twenty-five articles, but submitted only two; the White Paper, and
the United States Department of Justice Guidelines.  Neither of those documents contains
information about underlying scientific studies or evidence of their
validity.  Moreover, Dr. Connell
testified that extensive research had been conducted by others in the area, but
did not discuss the specifics of the studies and research underlying the tenets
on which she would rely.  Therefore, we
agree with the State that based upon the record before it, the trial court
could have reasonably concluded that Appellant failed to carry his burden of
showing that the proffered testimony was scientifically reliable.  

Relevance








Even when a theory or methodology satisfies the Ascientific knowledge@ requirement, in order to be admissible, expert testimony also must Aassist the trier of fact to understand or
determine a fact in issue.@  Tex. R. Evid. 702.  Stated another way, to be admissible under
rule 702, expert testimony must be both relevant and reliable.  Kelly, 824
S.W.2d at 572.  As applied to
expert testimony, rule 702 requires that the expert witness tie or relate the
pertinent facts of the case to the subject of her testimony.  Jordan v. State,
928 S.W.2d 550, 555 (Tex. Crim. App. 1996).

In this case, Dr. Connell=s opinions failed to take into account enough pertinent facts to be of
assistance to the jury.  Dr. Connell did
not factor in the effect of Appellant=s voluntary, written confession admitting that he shot Menendez.  Furthermore, the focus of Dr. Connell=s testimony was on the reliability of the live lineup procedure, and
she does not appear to have taken into account testimony that, prior to the
live lineup, Garcia picked Appellant out of the photospread
with seventy percent certainty.  Dr.
Connell=s stated grounds for testifying did not include an opinion that the
reliability of the identification at the live lineup affected Garcia=s unequivocal in-court identification of Appellant.

Much of Dr. Connell=s testimony focuses on matters that do not require expert
testimony.  For example, her concerns
about the variability in the live lineup participants, whether there were
things that might obscure the opportunity to view the culprit, and whether
Garcia identified Appellant in the live lineup based upon seeing him in the photospread were brought out before the jury with other
witnesses. Additionally, Detective Stanton admitted that the live lineup was
not ideal.  Such matters were easily
understood by the jury without expert testimony.  A number of these issues relate to Garcia=s credibility, which is a matter within the jury=s province and not a proper area for expert opinion.  Therefore, based upon the record at the time
of its ruling, the trial court could have reasonably concluded that Appellant
did not meet his burden to show that Dr. Connell=s testimony was relevant. 

Because the trial court could have reasonably concluded that Dr.
Connell=s testimony was not reliable or relevant, the trial court did not
abuse its discretion in excluding the testimony.  Accordingly, Appellant=s first issue is overruled.

 

                                           Voluntary
Conduct

In his second issue, Appellant contends that the trial court erred by
failing to instruct the jury on the legal requirement of voluntary
conduct.  The State argues that there was
no evidence Appellant=s conduct was involuntary.








Applicable Law

Section 6.01(a) of the Texas Penal Code provides that Aa person commits an offense only if he voluntarily engages in conduct,
including an act, an omission, or possession. 
A Tex. Pen.
Code Ann. ' 6.01(a) (Vernon 2003).  Voluntariness
within the meaning of section 6.01(a) refers only to one=s own physical bodily movements. 
See Rogers v. State, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003); Brown v. State, 89 S.W.3d
630, 633 (Tex. Crim. App. 2002).  If a physical movement is the nonvolitional result of someone else=s act, is set in motion by some independent nonhuman force, is caused
by a physical reflex or convulsion, or is the product of unconsciousness,
hypnosis or other nonvolitional impetus, that
movement is not voluntary.  See Rogers,
105 S.W.3d at 638. 

Conduct is not rendered involuntary merely because an accused does not
intend the result of his conduct.  See
Adanandus v. State, 866 S.W.2d 210, 230 (Tex. Crim.
App. 1993).  If the accused engages in a
voluntary act and has the requisite mental state, his conduct is not rendered
involuntary simply because the conduct also included an involuntary act or
because the accused did not intend the result of his conduct.  See Cruz v. State, 838 S.W.2d
682, 686 (Tex. App.CHouston [14th Dist.] 1992, pet. ref=d); Owens v. State, 786 S.W.2d 805, 809 (Tex. App.CFort Worth 1990, pet. ref=d).  Furthermore, the Avoluntary act@ requirement does not necessarily go to the ultimate act (e.g.,
pulling the trigger), but means only that criminal responsibility for the harm
must include an act that is voluntary (e.g., pointing the gun).  See Rogers, 105
S.W.3d at 638.

A lack of voluntary conduct is a defense on which, if the issue is
raised by the evidence, the defendant is entitled to an instruction.  See Brown v. State, 955 S.W.2d 276, 279-80 (Tex. Crim.
App. 1997).  If there is any evidence,
whether it is strong, feeble, unimpeached, or
contradicted, which indicates that a shooting was the result of involuntary
conduct, a trial court must give a voluntary conduct instruction.  See id. at
279.  Where the evidence shows an
involuntary act that is merely a part of the overall voluntary conduct, the
trial court is correct in refusing a requested charge on voluntary
conduct.  See Owens, 786 S.W.2d at 809.

Analysis

During the guilt-innocence phase of the trial, the State introduced
Appellant=s written statement in which he stated the following:

 








Then the Mexican guy grabbed onto me, and I am
not going to lie about it, I shot the guy with the pistol.  I did not mean for it to happen, but the guy
grabbed onto my hand and the gun went off. . . .  When I shot the man, I was still struggling
with him.  We wind up tumbling out of the
door and I hit my right arm against something in the van and cut my arm.  That was about the time that the gun had gone
off.

 

 

Detective Stanton testified that Garcia said at the scene that
Appellant fired once after Menendez tried to shove him.  Officer J. R. Stephenson testified that there
Amay have been a struggle over something at the vehicle and a single
shot.@  Finally, Garcia testified that
she saw Aphysical contact@ between Menendez and Appellant at about the time of the shot.   Appellant contends that this evidence
amounts to at least some evidence that the shooting was the result of
involuntary conduct.

We disagree. 

Appellant seems to assert that he did not intend to shoot Menendez
during the robbery. In support of his argument, he points to the evidence that
he and Menendez struggled over the gun immediately prior to the shooting.  However, this evidence did not entitle
Appellant to a voluntariness instruction.  Appellant created the situation leading to
the shooting.  He voluntarily entered
Menendez=s van, demanded Menendez=s money, and pointed the gun at Menendez.  The fact that Appellant did not intend to
engage in a struggle with Menendez does not render involuntary the struggle or
any of Appellant=s bodily movements during the struggle.  See Adanandus,
866 S.W.2d 230. 
Moreover, evidence that an accused did not intend for the gun to
discharge, that the gun just Awent off,@ or that it was an accident does not sufficiently raise the issue of
involuntary conduct.  See Richardson
v. State, 816 S.W.2d 849, 851 (Tex. App.BFort Worth 1991, no pet.); Owens, 786 S.W.2d at 810.

There is no evidence that Appellant=s act of shooting and killing Menendez was involuntary.  Therefore, Appellant was not entitled to an
instruction on voluntary conduct. 
Appellant=s second issue is overruled.

 

                    Voluntariness of Appellant=s Written Statement








In Appellant=s third issue, he contends the trial court erred by overruling his
request for an instruction in the jury charge that the jury could not consider
his written statement unless it believed that the statement was made free of
duress and coercion.  The State responds
that there was no evidence that Appellant=s confession was the product of duress or coercion.

Applicable Law

The Texas Code of Criminal Procedure provides that A[a] statement of an accused may be used in evidence against him if it
appears that the same was freely and voluntarily made without compulsion or
persuasion....@  Tex. Code Crim. Proc.
Ann. art. 38.21 (Vernon 1979). 
When the evidence raises a fact issue as to compulsion or persuasion in
obtaining a confession, a defendant has a statutory right to have the jury
charged accordingly.  See Mendoza
v. State, 88 S.W.3d 236, 239 (Tex. Crim. App. 2002). 
The only question is whether, under the facts of the particular case,
the defendant raised the issue by the evidence, thus requiring the jury
instruction.  An instruction under
article 38.23 directs a jury to disregard evidence if it resolves, in a defendant=s favor, a factual dispute concerning the manner in which the evidence
is obtained.  Thomas v. State,
723 S.W.2d 696, 707 (Tex. Crim. App. 1986); see
also Tex. Code Crim.
Proc. Ann. 38.23(a) (Vernon Supp. 2004). However, a trial court is
required to include an article 38.23 instruction in the jury charge only if
there is a factual dispute as to how the confession was obtained.  See Balentine
v. State, 71 S.W.3d 763, 773-74 (Tex. Crim.
App. 2002); Thomas, 723 S.W.2d at 707.

Analysis

Appellant did not testify at trial. 
Moreover, the testimony concerning the various interviews and the method
of taking Appellant=s written statement is undisputed. 
Therefore, Appellant was not entitled to a 38.23 instruction.  See Balentine,
71 S.W.3d at 774; Thomas, 723 S.W.2d at
707.  Nevertheless, Appellant contends in
his brief that the following evidence raises a fact issue as to whether the
statement was the product of compulsion or persuasion:

 

1.         Appellant
was interrogated three times by the Arlington police.  The third interview resulted in the written
statement.

 

2.         The
interrogations were in a Astark and small@ room with no video equipment available.

 

3.         Appellant
denied participation in the shooting in the first interview.  The detectives advised him of the seriousness
of a capital murder charge.

 

4.         During
the second interview, the detective explained the difference between murder and
capital murder and advised him that the death penalty was an option.  Appellant was upset by this explanation. 

 








5.         Detective
Stanton was alone with Appellant during the third interview and drew certain
diagrams for Appellant of the scene.  The
argument of Appellant was that this was suggestive of what the detective wanted
Appellant to include in his statement.

 

6.         The
statement Appellant made at the third interview was not written by Appellant,
but was taped by Stanton.

 

 

We first note that in his discussion of this issue, Appellant merely
states that A[r]egardless of the relative strength of
this evidence, it certainly raised a fact issue as to whether Appellant=s statement was the product of compulsion or persuasion.@  Appellant does not further
develop this argument. Specifically, he fails to address the import of the uncontroverted evidence that (1) Appellant requested the
third interview and communicated his request by a telephone call to Detective
Stanton, (2) the detectives= explanation of the difference between capital murder and murder and
their statement that the death penalty was a possible punishment in the case
was prompted by Appellant=s comment that he did not understand why he was charged with capital
murder, and (3) Detective Stanton drew the crime scene diagram and asked
Appellant to use the diagram as a visual aid after Appellant admitted that he
shot Menendez.  Therefore, he presents
only a conclusory statement for our consideration. Conclusory statements unsupported by argument or authority
are inadequately briefed and thus are waived. 
Lockett v. State, 16 S.W.3d 504, 505 n.2 (Tex. App.CHouston [1st Dist.] 2000, pet. ref=d).  Even if the issue had not
been waived, however, Appellant has not shown that the trial court=s denial of the requested jury instruction was error.

There is no evidence in this case of any type of practice that can be
described as inherently coercive.  The
facts pointed out by Appellant in his brief fail to show official coercive
conduct of such a nature that his statement was unlikely to have been the
product of his own free will.  To the
contrary, the undisputed evidence is that Appellant requested the third meeting
with Detective Stanton, was advised of his rights as he had been on prior
occasions, and immediately began incriminating himself.  Therefore, the trial court did not err in
denying Appellant=s requested jury instruction concerning the voluntariness
of his written police statement. 
Accordingly, Appellant=s third issue is overruled.

 

                          Admission of Secondhand Hearsay








Appellant asserts in his fourth issue that the trial court abused its
discretion by allowing the State to elicit secondhand hearsay concerning an
alleged confession he made to a third party. 
The State argues that Appellant has waived this complaint by failing to
request a limiting instruction.

The Evidence

On August 17, 1999, the police received a Crime Stoppers tip
indicating that a possible assailant in the case was a person named AKerry White@ and that he lived at the La Jolla Apartments.  Pickrom testified
that he spoke to Detective Stewart on August 18, 1999 at the La Jolla
Apartments.  However, he also testified
that he did not remember what, if anything, he told Detective Stewart about
Appellant=s alleged involvement in the shooting. 
Further, Pickrom testified that Appellant
never stated to Pickrom that he shot Menendez and
never told Pickrom that he shot anybody.  During Detective Stewart=s testimony, the court conducted a hearing to determine if Detective
Stewart would be allowed to testify about statements Pickrom
allegedly made to him.  During the
hearing outside the presence of the jury, Detective Stewart testified that Pickrom told him that Appellant Awas responsible for the killing@ and that Appellant made Asome admission regarding the killing.@  Defense counsel objected that
this was improper impeachment.  The
prosecutor then withdrew the question. 
However, the lead detective, Detective Stanton, was later allowed to
testify, over objection, to the contents of the conversation between Pickrom and Detective Stewart.  Specifically, Detective Stanton testified
that A[Pickrom] told Detective Stewart that
[Appellant] had been bragging about having killed a Mexican guy over on Peach
Street.@  In short, Detective Stanton
was allowed to testify about a conversation which he obviously did not hear
himself.

Standard of Review and Applicable Law

The admission of evidence is a matter within the trial court=s discretion.  See Roberts
v. State, 29 S.W.3d 596, 600 (Tex. App.BHouston [1st Dist.] 2000, pet. ref=d).  Therefore, the trial court=s admission of evidence is reviewed under an abuse-of-discretion
standard.  See id.  As long as the trial court=s ruling is within the Azone of reasonable disagreement,@ there is no abuse of discretion, and the reviewing court must uphold
the trial court=s ruling.  Id.

Hearsay is Aa statement, other than one made by the declarant
while testifying at the trial or hearing, offered in evidence to prove the
truth of the matter asserted.@  Tex. R. Evid. 801(d).  Hearsay is not admissible, absent a
rule-based or statutory exception to the hearsay rule.  Tex.
R. Evid. 802. 








The testimony complained of in this case consists of two levels of
hearsay.  In the first level, Pickrom is the declarant whose
out-of-court statement to Detective Stewart was being offered with no
limitation by the State and was thus being offered for the truth of the matter
asserted.  In the second level, Detective
Stewart is the declarant whose out-of-court statement
to Detective Stanton was being offered with no limitation by the State and was
thus offered for the truth of the matter asserted.  In this type of double hearsay situation, the
evidence is admissible only if each part of the combined statement is covered
by an exception to the hearsay rule.  Tex. R. Evid. 805.

Appellant contends that the court abused its discretion by allowing
the double hearsay testimony.  He also
contends that he was harmed by the error because the improperly admitted
evidence Aeffectively gutted@ his argument at trial that his written statement was coerced.  In other words, it was much easier for the
jury to believe that the written statement was made free of coercion when they
heard that he had made admissions to people on the street.  Consequently, Appellant contends, this error
had a substantial and injurious effect on the jury=s verdict.  Appellant did not
request a limiting instruction which could have prevented the jury from
considering Pickrom=s statement for the truth of the matter asserted.  Because Appellant failed to request a
limiting instruction, which could have cured any error in admitting the
testimony at issue, Appellant cannot complain of the error, if any, on appeal.  See Hunt v. State, 904 S.W.2d
813, 817 (Tex. App.CFort Worth 1995, pet. ref=d).

The State also argues that even if the issue were properly preserved
for review, the testimony was not hearsay because it was offered to show a link
in the investigation.  In support
of its argument, the State cites Jones v. State, 843 S.W.2d 487
(Tex. Crim. App. 1992).  In Jones, the arresting officer
testified during the guilt-innocence phase of the trial that after listening to
another officer question a witness, he began to suspect Jones as the actor in
the murder he was investigating.  He then
had an arrest warrant issued for Jones. 
The State points out that the statement in Jones was not
introduced for the truth of the matter asserted, but to explain how the officer
came to suspect Jones in the murder.  The
court of criminal appeals reached the same conclusion.  However, the statement made by Pickrom to Detective Stewart and ultimately recounted by
Detective Stanton in front of the jury cannot be characterized as analogous to
the statement in Jones. 
Therefore, we will assume error and conduct a harm analysis.








Violation of an evidentiary rule that results in the erroneous
admission of evidence is treated as nonconstitutional
error.  Hankton
v. State, 23 S.W.3d 540, 548 (Tex. App.BHouston [1st Dist.] 2000, pet. ref=d).  A nonconstitutional
error must be disregarded unless it affects a substantial right.  Tex. R. App. P. 44.2(b).  A substantial right is not affected unless
the error had a Asubstantial and injurious effect or influence in determining the jury=s verdict.@  King
v. State, 953 S.W.2d 266, 271 (Tex. Crim.
App. 1997).

The court of criminal appeals has determined that substantial rights
are not affected by the erroneous admission of evidence Aif the appellate court, after examining the record as a whole, has
fair assurance that the error did not influence the jury, or had but a slight
effect.@  Motilla v.
State, 78 S.W.3d 352, 355 (Tex. Crim. App.
2002).  In assessing the
likelihood that the jury=s decision was adversely affected by the error, the appellate court
should consider everything in the record, including any testimony or physical
evidence admitted for the jury=s consideration, the nature of the evidence supporting the verdict,
the character of the alleged error, and how it might be considered in
connection with other evidence in the case. 
Id.  The reviewing
court may also consider the jury instructions, the State=s theory and any defensive theories, closing arguments, and even voir dire, if applicable. 
Id.  Whether the
State emphasized the error can also be a factor.  Id.  








The evidence before the jury in this case included Appellant=s written confession as well as Garcia=s identification of Appellant in the photospread,
in the live lineup, and in court.  The
jury heard that Appellant gave the detectives a false alibi and was hiding on
the roof of his friend=s apartment when law enforcement wanted to question him about the
murder.  This indicates a consciousness
of guilt that could be considered affirmative evidence of Appellant=s culpability in Menendez=s death.  See Huffman v.
State, 775 S.W.2d 653, 660 (Tex. App.BEl Paso 1989, pet. ref=d); Bigby v. State,
892 S.W.2d 864, 884 (Tex. Crim. App. 1994).  Appellant points out that the State
emphasized the testimony by telling the jury during closing argument at
guilt-innocence that Detective Stewart had Averification from Nate Pickrom
that Kerry Mims did it....@  However, based upon our review
of the record as a whole, we conclude that this reference had only a slight
effect, if any, compared to the evidence indicating Appellant=s guilt.  Consequently, we
conclude that even absent waiver, the trial court=s error in admitting Detective Stanton=s statement did not have a substantial and injurious effect or
influence on the jury=s verdict.  Therefore, the error
must be disregarded because it did not affect a substantial right.  Appellant=s fourth issue is overruled.

 

                                  State=s Final Argument at Punishment

In his fifth and final issue on appeal, Appellant asserts that the
trial court erred by allowing the State, during closing argument at the
punishment phase, to castigate the jury concerning its guilt-innocence
verdict.  The State asserts that the
argument was a proper plea for law enforcement and a response to opposing
counsel=s argument or, alternatively, that if error occurred, it must be
disregarded because it did not affect a substantial right.

During the guilt-innocence phase, the State asked the jury to convict
Appellant of the charged offense of capital murder.  The jury convicted Appellant of the lesser
offense of felony murder, an unintentional crime.  During the final argument at the punishment
phase, the prosecutor made the following statements: 

 

[PROSECUTOR]:           Last Friday when I talked to you, I opened my argument and
I said this is a simple case.  Either you=ll believe B I said if you believe Sophia, you will find him
guilty of capital murder; and if you believe this self-serving confession, you
will find him guilty of just murder B the lesser-included of murder, and I don=t back off from that one bit.  I don=t back off of it one bit.  But I do B I am disappointed that you 12 people chose to
believe this document over the lady.

 

Now, after this is over B and this happens from time to time B there is going to be some of you who say, AOh, I believed her.  I absolutely believed her, but there were
others on the jury that didn=t, and I just compromised my verdict.@

 

Well, I am disappointed in you too because that wasn=t the law and that wasn=t the charge. 
You were supposed to, all 12 of you acquit -

 

[APPELLANT=S COUNSEL]:       I
would object.  That was the law.  The jury B insulting the jury=s verdict is not proper argument, and I object.

 

THE COURT:                 Overruled.

 








[PROSECUTOR]:           The law that, so you didn=t believe the lady. You chose to believe
this.  Well, let me tell you what a
verdict like this sends.  I thought
collectively you would get it, but you just don=t.  The
rape victim who says, AHe held a gun to my head, but I still did not
want to be raped, I wanted to fight and struggle,@ and gets killed, that=s not an intentional killing.  How about that?

 

How about you=re in your own home B and you know his propensity, from Mississippi,
to break into houses B he comes in and you defend your home.  You=re
struggling with him.  That=s not an
intentional killing.  That=s not a
capital murder.  That=s
ridiculous.  That is
ridiculous.  A criminal B

 

[APPELLANT=S COUNSEL]:       Excuse
me.  I would object again.  That=s
improper argument.  That decision
has been made by the jury, and it is improper to tell the jury the verdict B

 

THE COURT:                 Overruled.  Go ahead.

 

[PROSECUTOR]:           If you missed it, it is ridiculous.  This gun, his weapon of choice, the one he
likes, the chrome-plated ones, the flashy ones, he takes that and he approaches
someone with a loaded weapon ready to shoot, and you have the audacity to
what?  Turn and run?  Or to wave your arms?  There is some kind of physical contact and he
kills you and it is not capital murder?  Ridiculous.

 

This lady, five minutes after her husband is
dead, is approached by the police and she tells them the best way she can in
her language what happened.  And she
showed you.  She got up there and she
demonstrated the physical contact.  And
when that=s interpreted for the first officer that arrives
on the scene and for the second and for the third and for the fourth, struggle,
struggle, struggle, they repeat their error. 
They are wrong, but it is like a runaway rumor.  You never can track it down.  Everybody from then on says struggle, struggle,
struggle, and I guess y=all bought it too.

 

Because she told you how it was.  She saw it. 
She saw her husband shot.  She saw
B told you how he fell out, and when they tumbled
out, I guess, tumbled out the door turns into struggle for someone switching
languages.  Can=t you see how it would happen?

 

And do you know what about this thing?  People B people, I have done this for awhile.  Don=t you think that people that have been to the
penitentiary one time get a little clue about how to tell the cops, how to get
next to the straight people of the world. 
And if you=re
in a bind, just say, AI=m sorry.  I didn=t mean it. 
It must have been a struggle.@

 

Don=t you think people that have been twice to the
penitentiary might have a clue abut what to say in here, start out denying and
then when they have to flip it over, say, AOh, gosh, I=m sorry. 
I didn=t mean for it to happen,@ all these other things.  And that B AOh, I was doped up too.@  What
else?

 








And the third felony up here and carrying the
gun before.

 

From the defense argument last week.  You go
home, you go home.  Get your toothbrush,
touch up your makeup, shave your face, whatever you are
going to do.  Look in the mirror next
week, next month like Sophia does with her three daughters.  Did you do the right thing down here?  I submit not. 
I submit not.  They won.

 

You can go back and give him a life sentence and
a $10,000 fine, and Mr. Mims won. 
Because a life sentence for capital murder is different from this life
sentence you are going to give him.  He=s getting less. 
That=s
why they call it a lesser charge.

 

[APPELLANT=S COUNSEL]:       Excuse
me, Judge.  I would object.  That=s
outside the record and it=s
not part of the Court=s
instructions.

 

THE COURT:                 Overruled.

 

[PROSECUTOR]:           Take a good look in that mirror this afternoon, this
evening, tomorrow morning.  Think did we
do the right thing.  If I was on that
stand and witnessed a horrible act and something happened to me or mine and I
got up there and had my identity called into question, had what I saw called
into question, would 12 citizens sit over there and say, AMaybe there was a struggle.@

 

You know what that does?  It blames the victim.  You just give people like this to take to the
penitentiary a story to say if you get caught next time, say there was a
struggle.  You won=t get capital murder; you=ll get something less.

 

My boss is two floors down.  If you want to complain
about this argument, call him up and do it because this is just B it=s
just wrong.  You have already made
one mistake.  Don=t make another
one.  Somebody back there have the guts
to say B

 

[APPELLANT=S COUNSEL]:       Excuse
me, Judge.  Can I have a continuing
objection to telling the jury they have made a mistake concerning their
verdict?

 

THE COURT:                 Yes, sir.

 

[PROSECUTOR]:           Somebody have the guts back there to say, AWhy not a life sentence?@  How
about somebody showing some fortitude and say, AWhy not a life sentence?@  This is
not just Jay=s and my community; it=s yours.

 

Do you want a man that you have now convicted of
a fourth felony that=s carrying these around monthly in July and August, do you want him out in our community?

 








If you do, give him less.  If you do, give him less.  Take a good look in that mirror when you get
home.

 

Thank you.

 

 

Applicable Law and Analysis

Proper jury argument falls into four general categories: (1) summation
of the evidence presented at trial; (2) reasonable deduction from the evidence;
(3) answer to argument of opposing counsel; or (4) a plea for law enforcement.  Jackson v. State, 17 S.W.3d
664, 673 (Tex. Crim. App. 2000) (citing McFarland
v. State, 845 S.W.2d 824, 844 (Tex. Crim.
App. 1992)).  Even when arguments exceed
the boundaries of these permissible groups, they will not constitute reversible
error unless they are manifestly improper, violate a mandatory statute, or
inject new, harmful facts into the case. 
Wesbrook v. State,
29 S.W.3d 103, 115 (Tex. Crim. App. 2000); see
also Reed v. State, 991 S.W.2d 354, 362-63 (Tex. App.BCorpus Christi 1999, pet. ref=d).  The remarks must have been
a willful and calculated effort on the part of the State to deprive an
appellant of a fair and impartial trial. 
Wesbrook, 29 S. W.3d at 115.

Here, the jury convicted Appellant of the lesser offense of felony
murder, an unintentional crime, rather than the charged offense of capital
murder.  In his argument, the prosecutor
expressed his disdain for the jury verdict and his disappointment that the jury
apparently believed Appellant=s self-serving written statement over Garcia=s eyewitness testimony. 

Appellant contends that the argument in this case invaded the province
of the jury because it was clearly directed at making the jury second guess its
unanimous guilty verdict.  According to
Appellant, the prosecutor invited the jury to disregard their oath and to
assess Appellant=s punishment based on shame or embarrassment for not giving the State
a capital murder verdict.  Finally,
Appellant asserts that the error had a substantial and injurious effect on the
jury=s verdict since the life sentence set by the jury was the maximum term
of imprisonment.








The main point of the prosecutor=s argument was that a lengthy sentence was warranted in this
case.  He chastised the jury about their
verdict in the guilt-innocence phase, but continued to refer back to the
evidence as he did so.  The use of the weapon and Appellant=s
prior criminal convictions were a consistent theme throughout the
argument.   In context, the State=s chastisement of the jury for its verdict at the guilt-innocence
phase was in the sense of asking the jury to protect the community by imposing
a life sentence in light of the facts of Menendez=s murder and Appellant=s criminal history.  The
prosecutor did state some of his personal opinions concerning the issues in the
case, but all could be referred back to some evidence in the record.  The statements were not only a general plea
for law enforcement but also a request that the jury assess what he believed to
be the proper punishment in the case.  A
prosecutor may argue his opinions concerning issues in the case so long as the
opinions are based on the evidence in the record and do not constitute unsworn testimony.  McKay v. State, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985). 


Based upon our consideration of the State=s argument as a whole, we conclude that the State=s punishment argument was within the permissible limits of a plea for
law enforcement.  See Lange v.
State, 57 S.W.3d 458, 470 (Tex. App.CAmarillo 2001, pet. ref=d); Arthur v. State, 11 S.W.3d 386, 393 (Tex. App.CHouston [14th Dist.] 2000, pet. ref=d); King v. State, 4 S.W.3d 463, 464-65 (Tex. App.CHouston [1st Dist.] 1999, no pet.). 
Moreover, under the circumstances shown in this case, a life sentence
cannot be considered unreasonable.  The
proof established a robbery and murder which can be considered an extreme act
of violence.  Appellant used a deadly
weapon to threaten, and ultimately take, another=s life and property.  Conviction
for three prior felonies failed to deter him from further crimes.  At the time the instant case was filed, Appellant was out on a $500 bond for the misdemeanor offense
of unlawfully carrying a weapon.  

We reiterate that unless a prosecutor=s argument is extreme or manifestly improper or injects new and
harmful facts, no reversal is required.  Duffy v. State, 567 S.W.2d 197, 206 (Tex. Crim. App. 1978). 
We hold that the argument here is not of that character.  Appellant=s fifth issue is overruled.

 

                                                                 Conclusion

Because we have overruled Appellant=s issues one, two, three, four, and five, we affirm the
judgment of the trial court.

    DIANE
DEVASTO   

     Justice

Opinion delivered
April 30, 2004.

Panel
consisted of Worthen, C.J., Griffith, J., and DeVasto, J.

 

                                                             (DO
NOT PUBLISH)











[1] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d
469 (1993).





[2]
The Ahard@ sciences are areas in which precise
measurement, calculation, and prediction are generally possible, including
mathematics, physical science, earth science, and life science.  The Asoft@ sciences, in contrast, are generally thought to
include such fields as psychology, economics, political science, anthropology,
and sociology.  Weatherred v.
State, 15 S.W.3d 540, 542 n.5 (Tex. Crim.
App. 2000) (citations omitted). 
The factors to evaluate the reliability of hard sciences are stated in Daubert, 509 U.S. at 593-94, 113 S. Ct. at
2796-797, and Kelly, 824 S.W.2d at 573.