Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

# MEMORANDUM OPINION

No. 04-08-00492-CR

Jonathan **REYES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CR-3960
Honorable Pat Priest, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:        Catherine Stone, Chief Justice
                Phylis J. Speedlin, Justice
                Steven C. Hilbig, Justice

Delivered and Filed:   September 2, 2009

AFFIRMED

Jonathan Reyes appeals from his conviction on four counts of aggravated sexual assault of

a child, asserting the evidence is legally and factually insufficient to support the jury's verdict and

that he received ineffective assistance of counsel at trial.  We affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

Idelia and Jonathan Reyes were married and had three children, two daughters and a son, all under the age of five years. During the months preceding February 2007, Reyes had been working out of town as a painter during the week and would return home on Friday afternoon to spend the weekend at home; he would then leave on Monday morning for his out-of-town job. On February 4, 2007, a Sunday, the family went out to breakfast but then Idelia and Jonathan argued about which park to take the children to visit. Idelia dropped off Reyes at home and took the children to Woodlawn Lake park. While at the park, A.R., four years and eleven months old, made an outcry to her mother about sexual abuse. Idelia testified that A.R. came up to her and asked to go to Walmart to buy a toy. Idelia replied, "You've got to ask your dad." A.R. responded, "I don't want him doing those things to me anymore." Idelia questioned her daughter, asking "What are you talking about? Does he hit you?" A.R. answered, "No." Her mother then asked, "Does he touch your privates?" A.R. answered, "No." Idelia then told A.R., "Well, you need to tell me." A.R. replied that she could not tell her because, "[h]e's going to get mad. He said he'd hit me if I tell you." After her mother kept encouraging her to tell her, A.R. stated, "He makes me kiss his privates." Idelia understood that to mean oral sex. She asked A.R. "if she was sure," explaining that "if you're lying, daddy can go to jail." A.R. stated, "No, I'm not lying." Idelia called Reyes' sister, Stephanie Guerra, and told her what A.R. had said. Idelia was crying and saying, "I don't know what to do." Stephanie told Idelia to "do what you need to do for your child" and "if you believe your child, you call the police and make the claim." Idelia then called the police to come to her home.

San Antonio Police Officer Dennis Cartwright responded to the call and spoke to Idelia, A.R., and Reyes at the residence. Cartwright testified that A.R. told him the same thing that she told

her mother at the park. Detective Lisa Miller from the Sex Crimes Unit asked Cartwright to request A.R. and Idelia, as well as Reyes, to voluntarily go to the police station to make statements, which they did. Detective Miller interviewed Reyes, who stated that he wanted to give his side of the story. Miller testified, however, that Reyes did not answer her questions, but would "redirect the conversation to something else." Reyes did express his belief that Idelia had made up the allegations "to get back at him for not taking up for [her] in front of his father," who had made an offhand remark about Idelia's son.[1] Reyes became frustrated during Miller's interview and left.

When Detective Miller interviewed A.R. about her outcry of sexual abuse, A.R. was "very detailed about that activity." A.R. told Miller that, "sometimes when mamma is at work or when mamma is asleep, either at night or early in the morning, . . . daddy puts his private part in her private part." When Miller asked A.R. to tell her more about that, A.R. explained that her daddy has her change into a skirt and lay down on her back in the bedroom and he puts his private part in her private part. A.R. stated, "Daddy – to put his private part in my private part, daddy's standing up, but he has to go – he has to go a little downer." A.R. also told Miller that her daddy puts cream on his private part before he puts it in her private part, and he gets the cream out of mamma's purse. When talking to Detective Miller, A.R. sometimes referred to her daddy's "private part," or penis, as his "boo-boo." When asked to explain what a "boo-boo" is, A.R. pointed to her pubic area and told Miller that "it's daddy's private part. It's brown, and it's oval."

Finally, on the evening of February 4, 2007, A.R. was examined by Betty Mercer, a Sexual Assault Nurse Examiner at the hospital. When asked why she was there, A.R. told Mercer, "My dad made me kiss his boo-boo, his private part" and pointed to her genital area when asked to show

---

[1] Idelia's son was not the biological child of Reyes, but Reyes adopted him and treated him as his own son.

where a "boo-boo" is. A.R. further stated, "He put it all the way in my mouth" and that happened "a long time ago [when] I was still four." When asked whether it happened once or more than once, A.R. replied that it happened "a lot of times . . . I don't know how many, just a lot." A.R. stated it happened one time when they were watching TV and her mommy was at the store; she also stated that sometimes they did it in the bathroom and in her mommy's bed, or in the living room. She said she did not tell anyone because her daddy said not to tell. A.R. had some slight irritation in the vaginal area, but overall the results of her physical exam were nonspecific. Mercer testified that the nonspecific physical findings were consistent with the history of sexual abuse provided by A.R. Mercer also stated that "the majority of exams in sexually abused children are normal or nonspecific, regardless of the type of sexual contact."

At trial, A.R., six years old at the time, testified that "Jon," her "daddy," who she identified in court as Reyes, made her "kiss his privates" more than one time and his privates were kind of like her brother's privates, but she didn't know what a boy's privates are called. When asked if Jon had a name for his privates, A.R. said she did not remember. When asked if she had ever heard anyone say "boo-boo," she answered "No." A.R. testified that Jon would ask her to put on a "skirt without no shorts under it" and touch her bottom and make her kiss his privates, but she did not remember if Jon touched her "taco"[2] with his privates while she was wearing the skirt. A.R. stated the first person she ever told about kissing Jon's privates was her mommy. A.R. also identified the tube of her mother's hand cream and stated that Jon would put it on his privates when he made her kiss his privates. Jon would pull her hair when she did not want to kiss his privates, and he told her not to tell anyone. A.R. testified it made her feel sad when these things would happen.

---

[2] A.R. testified that her mom called A.R.'s front private a "taco."

Reyes testified and denied ever sexually abusing A.R. He stated his belief that A.R. felt hurt because he paid more attention to his son than to her. Reyes also testified that his relationship with Idelia was not good because she was "crazy" and "violent," and they argued all the time. Reyes testified that Idelia was mad at him after his father's comment about her son. Reyes also stated that Idelia did not get along with his parents, and once "tried to run over his mom and dad" in her car. He stated that, on the day of A.R.'s outcry, his sister Stephanie called to warn him that Idelia had called the police and was making allegations against him, and that Idelia and her parents were on their way over. Reyes stated that he also called the police that day because Idelia's stepfather is a bouncer and is "violent," but Reyes offered no corroborating proof that he made a call to the police. Reyes testified that Idelia told him that day, "I told you what I'm capable of doing." Finally, Reyes admitted having prior convictions for theft of an automobile and theft of a check for which he spent time in prison.

Reyes' cousin Dalia Lozano testified that she knew both Jonathan and Idelia for a long time, and they had "a pretty good relationship," but, "they would argue like every other couple." She saw Idelia "key" an ex-boyfriend's car one time. Roxanne Lozano, another cousin of Reyes, testified that Jonathan and Idelia were "always arguing." Finally, Reyes' sister, Stephanie Guerra, testified that Jonathan and Idelia loved each other but had "a rocky relationship;" they were "off and on" during the whole time they were together, with both of them "in the wrong." Stephanie and Idelia were very close and confided in each other a lot. Stephanie and her family used to joke with Idelia about having a "split personality" because she would have different moods on different days. On February 4, 2007, Idelia called Stephanie and told her what A.R. had said about Reyes. Idelia was crying hysterically, saying, "I don't know what to do." Stephanie told her to "do what you need to do for

your child . . . If you believe your child, you call the police, and you make the claim." Stephanie testified that she then called her mother, but never called her brother Jonathan that day. Finally, Stephanie stated she heard about an incident when Idelia was mad at Stephanie's parents, and drove off in a hurry, almost running over her mom and dad; she did not personally witness the incident.

The jury convicted Reyes on all four counts of aggravated sexual assault of a child–two counts of penetration of the child's sexual organ with his sexual organ, and two counts of penetration of the child's mouth with his sexual organ. TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B)(i), (ii) & 22.021(a)(2)(B) (Vernon Supp. 2008). The jury recommended, and the trial court assessed, a sentence of 45 years' imprisonment on each count to be served concurrently. Reyes filed a motion for new trial alleging, among other issues, that he received ineffective assistance of counsel. After a hearing, the trial court denied the motion for new trial. Reyes timely appealed.

## SUFFICIENCY

On appeal, Reyes asserts the evidence is legally and factually insufficient to support his conviction on all four counts of aggravated sexual assault. In reviewing legal sufficiency, we consider all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury is permitted to make reasonable inferences from the evidence, and, as the trier of fact, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Mosley v. State*, 983 S.W.2d 249, 254-55 (Tex. Crim. App. 1998). We resolve any inconsistencies in the testimony in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). In reviewing factual sufficiency, we consider all the evidence in a neutral light,

giving almost complete deference to the jury's determinations of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We will reverse the conviction only if the evidence in support of the verdict, although legally sufficient, is so weak that the verdict is clearly wrong and manifestly unjust, or if, considering conflicting evidence, the verdict is outweighed by the great weight and preponderance of the evidence. *Id.*; *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

As charged in the indictment, to convict Reyes of each count of aggravated sexual assault of a child, the State had to prove that he (1) intentionally or knowingly, (2) caused the penetration of the mouth of the child by his sexual organ (Counts I and III), or caused the penetration of the sexual organ of the child by his sexual organ (Counts II and IV), and (3) the child was younger than 14 years of age. TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B)(i), (ii) & 22.021(a)(2)(B). It is undisputed that the child victim, A.R., was younger than 14 years when the abuse occurred. Reyes contends on appeal that the evidence was insufficient to prove beyond a reasonable doubt that the alleged sexual abuse actually happened, and that, if it did happen, he was the perpetrator. His defense at trial was that he was innocent, and his ex-wife's animosity toward him caused her to make up the allegations and coach A.R. to repeat them.

With respect to Idelia's purported motive to fabricate the sexual abuse, Reyes points to the testimony at trial that he and Idelia argued a lot, and had a rocky relationship. Reyes himself testified that Idelia was angry at him because he did not defend her when his father made an unkind remark about her son; he also stated she was angry that he did not pay enough attention to A.R., and made the statement that he knew "what she was capable of." On the other hand, however, there was also testimony that Reyes had chosen to marry Idelia after she gave birth to her son and he had accepted

the boy as his own son. In addition, Reyes and Idelia already had a daughter, A.R., together, and subsequently had another daughter after they were married; that child was born only three months before A.R.'s outcry. In addition, Reyes' cousin testified they had a pretty good relationship with some arguments. Idelia testified that she was together with Reyes on and off for three or four years before they married, he was "the love of my life," and they had an "average marriage" where they "got in arguments but nothing out of the ordinary." She stated she still loves and respects Reyes for everything he did for her son, but not for what he did to A.R. Idelia explained she was hurt over the comment that Reyes' father made about her son, but she was not angry. At trial, A.R. denied that her mother ever told her to say things about her dad, and stated that everything she said about her dad did happen that way. It was the jury's role to judge the credibility of the witnesses, including assessing their motive to lie, and to choose to believe or disbelieve all or part of a witness's testimony. *Mosley*, 983 S.W.2d at 254-55; *Lange v. State*, 57 S.W.3d 458, 465 (Tex. App.—Amarillo 2001, pet. ref'd). Thus, the jury could have reasonably chosen to believe the testimony of Idelia and A.R., instead of Reyes and his family.

Reyes also asserts that, given the lack of physical evidence of abuse, the inconsistencies between A.R.'s testimony at trial and her outcry statements to her mother and Detective Miller made her not credible, and rendered the evidence insufficient for a conviction. He cites A.R.'s repeated responses during trial that she "did not know" or "did not remember" to show that she was unreliable, and was "following a script." One of the inconsistencies that Reyes stresses is A.R.'s statement at trial that she did not remember the name Jon had for his private part, and she had not heard of a "boo-boo." On the day of the outcry, A.R. used the terms "private part" and "boo-boo" interchangeably when talking about the abuse, and pointed to her pubic area to explain where those

body parts were located on her daddy. A.R. admitted on cross-examination that she was scared and afraid during her testimony. When the defense attorney asked her whether she understood that these things are very bad and that her dad is saying they did not happen, A.R. replied, "It did happen." In addition, the State admitted a tube of hand cream that Idelia testified came from her purse to corroborate A.R.'s statement that Reyes would use "cream from mamma's purse" during the sexual abuse. Moreover, Detective Miller testified that A.R. had an "excellent grasp" of the difference between telling the truth and a lie, and the fact that A.R. gave details about the things that happened to her, and offered them freely, is one criteria Miller uses to differentiate between a child who is a true victim and a child who has been coached.

Idelia testified that a few weeks before the outcry on February 4, 2007, she had noticed a change in A.R.'s behavior toward her dad. When Reyes would come home on Fridays, A.R. would not even get up, much less run over to him as she used to do; she would just say "oh, daddy's home." In addition, Idelia stated that during those weeks A.R. had been getting in trouble at school, and had stabbed a little boy with a pencil, which was unlike her. Idelia testified A.R.'s behavior improved after Reyes moved out and they divorced; as of the date of trial, A.R. was in the gifted and talented program and was not getting in trouble at school.

Idelia also testified that A.R. told her the sexual abuse happened the time that her mom had gone to La Fiesta by herself, and the time that A.R. was watching a Garfield movie with her dad. Idelia stated she usually went to bed early on weekends because Reyes was home to watch the children, and A.R. was permitted to stay up late on weekends to watch TV with her dad. A Time Warner Cable bill was admitted showing the Garfield movie was ordered on Pay Per View on Friday, January 26, 2007, one of the dates alleged in the indictment. In addition, Idelia testified that she

remembered going to La Fiesta by herself on the previous Saturday night, January 20, 2007, the other date alleged in the indictment. The evidence supporting the jury's verdict is clearly legally sufficient, and is not so weak that the verdict is clearly wrong or manifestly unjust; further, considering the conflicting evidence, the verdict is not outweighed by the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15.

Finally, with respect to identity, Reyes argues that there is evidence in the record that A.R. called him "Jon" or "J," not "daddy," which is inconsistent with her outcry that she was sexually abused by "daddy." He suggests that someone else was the perpetrator of the sexual abuse. However, read in context, it is clear from the record that A.R. used to call Reyes "dad" or "daddy," and only stopped calling him by that name after the outcry. Her mother, Idelia, testified that A.R. now calls Reyes "J" or "Jon," instead of "dad" or "daddy," because "he's not her dad anymore to her." During trial, A.R. identified Reyes in court as "Jon" and "my dad." When asked whether anyone had touched her body and made her feel uncomfortable, or made her touch their body, A.R. answered, "Jon." The prosecutor asked, "Jon your daddy?" and A.R. answered, "Yes," before going on to describe being made to "kiss his privates." Further, at the end of his direct examination, the prosecutor again asked her "Jonathan is your daddy, right?" and A.R. replied, "Yes." When asked whether she always called him Jon, A.R. explained that she calls him Jon now "because he's not my dad anymore." A.R. was clear in her testimony that "Jon" is the same person as her "dad" or "daddy," and she identified all the names as referring to Reyes. There was clearly sufficient evidence to prove the element of identity.

Having reviewed all the evidence, we hold there was both legally and factually sufficient evidence from which the jury could have reasonably found that Reyes committed the offenses of

aggravated sexual assault of a child, as charged in the indictment. Accordingly, we overrule Reyes' issues challenging the sufficiency of the evidence.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his third issue, Reyes asserts that his trial counsel rendered ineffective assistance in violation of the state and federal constitutions. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. To establish ineffective assistance of counsel, a defendant must prove by a preponderance of the evidence that: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him to such a degree as to deprive him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 770 n.3 (Tex. Crim. App. 1999); *Harling v. State*, 899 S.W.2d 9, 12 (Tex. App.—San Antonio 1995, pet. ref'd). To show deficient performance, the first prong of the *Strickland* standard, Reyes must prove that his counsel's performance fell below an objective standard of reasonableness and must rebut the presumption that counsel's decisions were based on sound trial strategy. *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999). To satisfy this prong, any allegations of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.* at 813. We do not look at isolated acts or omissions to determine the effectiveness of counsel; rather, we review the totality of the representation. *Id.*; *Harling,* 899 S.W.2d at 12. Absent record evidence to the contrary, we must presume that counsel's conduct fell within the wide range of reasonable professional assistance. *Thompson*, 9 S.W.3d at 813-814. With respect to the second *Strickland* prong, that counsel's deficient performance prejudiced his defense, a defendant must show there is a "reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (also stating

a "reasonable probability" is one sufficient to undermine confidence in the outcome). Failure to make the required showing of either *Strickland* prong, deficient performance or sufficient prejudice, will defeat a claim for ineffective assistance. *Thompson*, 9 S.W.3d at 813. The standard for reviewing counsel's performance has never been interpreted as meaning that a defendant is entitled to "errorless or perfect counsel." *Badillo v. State*, 255 S.W.3d 125, 129 (Tex. App.—San Antonio 2008, no pet.) (quoting *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990)).

Reyes presented his claim of ineffective assistance to the trial court in a motion for new trial, and the trial court denied his motion after a hearing on the issue of ineffective assistance. We therefore analyze Reyes' ineffective assistance issue as a challenge to the denial of his motion for new trial, and apply the *Strickland* test using an abuse of discretion standard of review. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004); *Biagas v. State*, 177 S.W.3d 161, 170 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). Therefore, we will reverse only if, viewing the evidence in the light most favorable to the trial court's ruling, the court's decision was arbitrary or unreasonable. *Biagas*, 177 S.W.3d at 170; *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007) (court abuses its discretion in denying motion for new trial only when no reasonable view of the record could support the ruling). In reviewing the court's denial of the motion for new trial, we give almost total deference to the court's determination of historical facts that are supported by the record, and may rely on implied findings of fact supported by the record to uphold the court's ruling even in the absence of expressly conflicting testimony or affidavits. *Charles*, 146 S.W.3d at 206; *State v. Herndon*, 215 S.W.3d 901, 905 n.5 (Tex. Crim. App. 2007) (noting appellate courts must defer to any reasonable implied fact findings the court might have made in denying a motion for new trial).

In his brief, Reyes argues that his counsel's performance was deficient because (1) he failed to have a trial strategy, (2) he was unprepared for trial because he failed to conduct a sufficient pretrial investigation into the facts of the case, failed to hire an investigator or healthcare expert, failed to interview witnesses before they testified, and failed to obtain rulings on pretrial motions, (3) failed to hire experts, obtain "alibi" evidence, and call additional witnesses that could have been beneficial to his defense, (4) failed to convey a plea offer by the State until the day of trial, and (5) made no attempt to exclude extraneous offense evidence.

*Lack of Defense Theory/Trial Strategy*.    Reyes first asserts that his attorney, Joe Gamez, failed to develop a defense theory, or "trial strategy." At the motion for new trial hearing, however, counsel articulated his theory of defense as showing that Reyes was innocent of the alleged conduct, *i.e.*, "that he did not do it." Counsel explained that Reyes repeatedly told him he did not commit the crime, and that his ex-wife had made it up to get back at him. When asked how he planned to establish his defense theory, Gamez stated that he planned to show that A.R. was "not telling the truth," and that Reyes did not commit the sexual abuse, through his cross-examination of the State's witnesses. Indeed, during his cross-examination of Idelia and A.R., defense counsel probed their motives to lie and relationships with Reyes, including asking A.R. whether her mother told her what to say. It is a common defense strategy to force the State to meet its burden of proof, and to attempt to prevent the State from meeting its burden by impeaching the State's witnesses and exposing inconsistencies in the State's case. In addition, the record shows that Gamez not only tried to undermine the State's case, but presented witnesses during the defense case-in-chief, including the testimony of Reyes, who testified that he did not commit the abuse and that Idelia had made it up, and the testimony of Reyes' sister and two cousins who described the "on and off" relationship

between Idelia and Reyes, as well as Idelia's moody nature. Just because a different attorney may have chosen to pursue a different defense theory or trial strategy does not mean that Gamez's approach was deficient. *Ex parte Ellis*, 233 S.W.3d 324, 331 n.20 (Tex. Crim. App. 2007). The record shows that Gamez had a defense theory and strategy which he consistently pursued throughout trial.

*Investigation & Preparation for Trial.* Reyes' main contention is that his attorney failed to conduct a sufficient pretrial investigation of the case by failing to meet with him and discuss the case enough times, failing to hire experts and interview witnesses, failing to sufficiently review the State's file, and failing to obtain hearings and/or rulings on all the pretrial motions he filed. Reyes asserts this deficient investigation and trial preparation negatively impacted his ability to make an informed decision about the State's plea offer.

Counsel has a duty to conduct a reasonable investigation of the facts of the case, or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003) (citing *Strickland*, 466 U.S. at 690-91). When considering whether counsel fulfilled his duty to conduct an independent investigation, including interviewing potential witnesses, we conduct an objective review of counsel's performance "measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Westerman v. State*, No. PD-1314-05, 2006 WL 2694388, at *4 (Tex. Crim. App. Sept. 20, 2006) (quoting *Wiggins*, 539 U.S. at 522-23). "[T]he reasonableness of an attorney's pretrial investigation into possible exculpatory evidence and witnesses depends upon the facts known by or available to counsel at the time he made the decision

whether to conduct further investigation, interview potential witnesses, or call them to testify." *Id.*
We are not permitted to second-guess counsel's decisions using the benefit of hindsight. *Id.*

Here, Gamez testified at the motion for new trial hearing that he reviewed the State's file
three to four times, and consulted with several other lawyers about the facts of the case and what
appeared on A.R.'s video statement and medical records. Gamez testified he talked to Reyes about
the facts of the case between six and nine times over the course of his year and a half representation;[3]
several discussions were at the courthouse on court dates. Gamez's paralegal and wife, Carmen,
testified that Reyes "would normally come in person" to the office to talk to Gamez; she also stated
Reyes and Gamez had a meeting at the courthouse one week before trial and went over the outcry
statement. Reyes testified at the hearing that although he went to Gamez's office, he never met with
Gamez there; Carmen always told him Gamez "was too busy." Reyes stated he only met with
Gamez at the courthouse on court days, and never for very long. He stated that Gamez showed him
the State's file and talked about the offense he was charged with, but he did not recall seeing the
indictment until the day of trial.

Two weeks before trial, the prosecutor faxed Gamez stating that he had copies of the DVD
ready for him to pick up. Gamez stated that he went by to pick up the DVD copy of A.R.'s statement
two or three times, but was unable to obtain it until right before trial. Gamez moved for a
continuance, telling the judge he needed more time because he just got the DVD, but the continuance
was denied. Gamez stated he attempted several times to get Reyes to watch the DVD before trial,
but Reyes refused. Gamez testified that Reyes kept telling him that Idelia and he were going to get

---

[3] Gamez stated that during that time he also represented Reyes in his divorce, which included obtaining a
protective order and temporary orders, and he posted Reyes' bond in the criminal case. The total fee that Reyes paid
Gamez included all those matters, plus the criminal jury trial.

back together, and saying, "Don't worry, the mother is not going to bring the little girl, she made it up and it is not going to happen." Reyes denied that Gamez ever asked him to view a DVD, and stated he did not know a DVD existed until trial.

Gamez conceded that he did not hire an investigator or health expert to assist in Reyes' defense. He explained that he "wanted to hire a forensic expert or health expert to examine . . . the victim," and looked for one prior to trial but was unable to hire one. Gamez testified that Reyes told him he did not have any money for an investigator or expert; he stated Reyes stopped paying him four months before trial. Carmen and Reyes both testified that he fell behind on his payments toward the attorney fee and painted houses to work off the fee balance. In addition, Carmen testified that Gamez wanted Reyes to go see a psychologist at the UT Health Science Center for evaluation and use at trial, but Reyes "would not go" because his father would get mad at him for missing work. Reyes denied ever being told to go see a psychologist, and stated he was never asked if he wanted to hire an investigator. Finally, Reyes' mother stated at the new trial hearing that she could have gotten the money to pay for an investigator if Gamez had asked. Carmen denied that the Reyes family ever asked Gamez to hire an investigator.

With regard to interviewing potential witnesses, Gamez conceded he did not attempt to interview any of the State's witnesses before trial. When asked whether he conducted any independent investigation other than what Reyes told him, Gamez stated he and Carmen "tried to see if we could find some reason why the ex-wife would be motivated to testify that way [*i.e.*, tell a lie]." Gamez stated that before trial he did talk to A.R.'s teacher who "was supposed to say that the little girl was a chronic liar [and] made up stories, [and] was a problem student;" however, when interviewed, the teacher did not say that and instead said A.R. was not a problem student. Gamez

decided the teacher's testimony would not be helpful and did not subpoena her. Carmen also testified she spoke to two teachers whose names Reyes supplied. In addition, Gamez testified he spoke to several other witnesses whose names were given by Reyes and his girlfriend, including the three defense witnesses who testified at trial. Gamez agreed that this type of case involving sexual abuse of a child, by its very nature, comes down to a credibility contest between the complainant and the defendant, and the case ultimately turns on which witness the jury chooses to believe. In addition, Gamez testified that he talked to the defense witnesses for five to ten minutes before they testified, including Stephanie Guerra. Stephanie confirmed at the hearing that Gamez talked to her about five to ten minutes before she testified at trial and he told her to "tell the truth." Carmen also stated she talked to Stephanie in the months prior to trial. Stephanie was supposed to deny being told about the abuse by Idelia, and then testify that she could not believe her brother would commit the alleged acts; instead, Stephanie's testimony corroborated Idelia's version of the outcry day. Gamez agreed that Stephanie's testimony was not helpful to Reyes, but stated he relied in part on Reyes' representations about what his sister would say.

Gamez filed multiple pretrial motions on Reyes' behalf; he did not file a request for disclosure of Rule 404(b) "other crimes" evidence. Gamez obtained a hearing and ruling on his motions concerning the outcry statements made to Idelia and Detective Miller, but did not obtain a ruling on any of the other pretrial motions. Gamez testified the prosecutor provided the requested discovery, faxing him copies of the outcry statements and copying the DVD. Reyes asserts on appeal that Gamez's failure to obtain a ruling on all the pretrial motions shows his performance was deficient; however, Reyes does not show that he would have been entitled to any specific relief if the court had ruled on any of the other pretrial motions. Further, the record shows that there was no

other Rule 404(b) evidence against Reyes other than the two prior convictions of which Gamez was aware.

The record shows that counsel did review and investigate the facts of the case within reasonable professional norms; further, Reyes has not shown that any further investigation would have produced additional evidence that would have benefitted his defense.

***Failure to Obtain "Alibi" Evidence and Call Additional Witnesses***.   Reyes argues that his counsel was deficient because he did not obtain "alibi" evidence showing that he was working out of town, and did not call additional witnesses, including an unnamed expert witness, who could have been beneficial to Reyes' defense.

Gamez stated that Reyes told him there was a possibility he was working out of town on the dates of the alleged offenses.  Gamez stated he and Carmen tried but were unable to obtain any documentary evidence to show Reyes was out-of-town on the relevant dates.  Carmen testified at the hearing that Reyes' mother faxed his employment records to her at the law office, but "the dates that Jonathan had said he was working out of town didn't coincide;" at the hearing, Carmen was unable to locate the employment records in Gamez's file.  At trial, testimony from Idelia and Reyes established that his work pattern during the relevant period was to work out-of-town during the week and return home on Friday afternoon and stay through Sunday; thus, the jury heard evidence that Reyes was working out-of-town, but was home on the weekends, during the period of sexual abuse. The indictment alleged the acts of sexual abuse between Reyes and A.R. occurred on or about January 20, 2007 and January 26, 2007 – a Saturday and a Friday, when Reyes was typically at home. Reyes points to no evidence, undiscovered by Gamez, that would have shown he was out-of-town on either of those two weekends in January 2007.  Moreover, during his own testimony, Reyes

admitted being at home and watching the Garfield movie with A.R.; the Time Warner Cable bill admitted into evidence confirmed that the Garfield movie was rented on January 26, 2007. Thus, even if Gamez had obtained employment records showing Reyes was working out-of-town in an attempt to prove an alibi defense, there was other evidence, including from Reyes himself, that he only worked out-of-town during the week and was home on weekends, from Friday afternoon through Sunday evening.

Reyes also complains that his attorney did not obtain additional witnesses to testify during trial; however, other than asserting Gamez should have hired an expert, as discussed *supra*, Reyes does not specify any particular witness whose testimony would have been beneficial to him and who was available to testify at trial. *See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) (failure to call a witness is irrelevant without a showing that the witness was available to testify and the defendant would have benefitted from his or her testimony). Gamez testified at the hearing that he asked Reyes several times for names of other witnesses, but never got them. Gamez stated it was difficult to find witnesses to testify on Reyes' behalf. During punishment, the only witness who would testify on Reyes' behalf was his brother; his mother and father refused to show up. Reyes has failed to show that any additional "alibi" evidence or witnesses were available, or that the evidence or testimony would have been beneficial to his defense.

***Failure to Convey Plea Offer***.    Reyes complains in his brief that Gamez failed to convey any of the State's plea offers to him until the day of trial; at the new trial hearing, Reyes testified that the first time he knew what the State was offering was on the day of trial; Gamez discussed it with him before the jury was selected. At the hearing, Gamez testified he tried to persuade Reyes to watch A.R.'s DVD statement to convince Reyes to take the State's initial plea offer of 15 years.

Gamez stated he expressed his belief that if A.R. testified the way she did on the DVD, then Reyes would get more than 15 years because this was "a very serious case." Gamez also testified that during a pretrial hearing on the first day of trial, the State made its final plea offer; Gamez conferred with Reyes and his girlfriend about the offer, and he had Reyes sign a handwritten rejection of the 15 year plea offer. Gamez said the State never made a plea offer of less than 15 years. The record shows that Gamez conveyed the State's final plea offer, which was the same as its initial offer of 15 years, to Reyes before the jury was selected and Reyes rejected it.

***Extraneous Offense Evidence.*** Finally, Reyes complains that Gamez made no attempt to exclude his two prior convictions for theft, and in fact mentioned them during his opening statement. Gamez testified that he and Reyes had already decided Reyes would testify, so he made a conscious decision to reveal Reyes' criminal history to the jury during his opening to "bring out all the dirty laundry" and take the sting out of the State impeaching him on the stand. Knowing Reyes would testify, Gamez made a strategic decision to reveal his prior convictions to the jury in opening statement. We cannot say this was not a reasonable trial strategy.[4]

***Summary***. Viewing the evidence in the light most favorable to the trial court's ruling, we conclude the court's denial of the motion for new trial was not arbitrary or unreasonable. The trial judge was in the best position to evaluate the credibility of the witnesses at the hearing, and to gauge the potential impact of any additional investigation, evidence, or witnesses on the outcome of the trial. As the fact-finder, the trial judge was entitled to assess the different versions of events given

---

[4] Reyes also suggests in his brief that Gamez should have challenged other jurors for cause during voir dire; however, he does not point out a specific juror who was allegedly disqualified, but not challenged, and does not show how the presence of any particular juror on the jury prejudiced him. The record reflects that Gamez did challenge two jurors for cause; at the new trial hearing, Gamez stated at that time he did not believe there were any other jurors he needed to challenge.

by counsel and Reyes, as well as the other witnesses, and choose to give more credence to counsel's explanations than to Reyes' version. *See Westerman*, 2006 WL 2694388, at \*7; *see also Beck v. State*, 573 S.W.2d 786, 791 (Tex. Crim. App. 1978). Moreover, even though Reyes presented the testimony of an expert witness at the new trial hearing, the trial court was not bound to accept the expert's opinions and conclusions – and in fact did not accept them.

Based on the record before us, we conclude the trial court did not abuse its discretion in declining to find ineffective assistance of trial counsel and in denying the motion for new trial. Reyes' third issue is overruled.

## CONCLUSION

Based on the foregoing reasons, we affirm the trial court's judgment.

Phylis J. Speedlin, Justice

Do Not Publish